# STATE OF MICHIGAN

# COURT OF APPEALS

LINDSEY PATRICK, and
CHRISTIAN PATRICK,

       Plaintiffs-Appellants,

v

VIRGINIA B. TURKELSON,
AUTO-OWNERS INSURANCE COMPANY,
and CITIZENS INSURANCE COMPANY OF
THE MIDWEST,

       Defendants-Appellees,

and

HOME-OWNERS INSURANCE COMPANY,

       Defendant.

FOR PUBLICATION
January 16, 2018
9:00 a.m.

No. 336061
Kent Circuit Court
LC No. 15-006324-NI

Before: METER, P.J., and BORRELLO and BOONSTRA, JJ.

BORRELLO, J.

In this automobile negligence action, plaintiffs, Lindsey Patrick and Christian Patrick,[1] appeal as of right the trial court's order granting defendant Virginia Turkelson's motion for summary disposition pursuant to MCR 2.116(C)(10) and dismissing the action with respect to all defendants.[2] For the reasons set forth in this opinion, we reverse the trial court's order and remand this matter for further proceedings consistent with this opinion.

## I. BACKGROUND

This case arises out of a car accident that occurred on February 12, 2013. Lindsey was driving on a service road as she was leaving a Spectrum Health parking lot when a vehicle driven

---

[1] Christian is Lindsey's husband. He was not involved in the automobile accident that is the subject of this case, and his only claim is for loss of consortium.

[2] Defendant Home-Owners Insurance Company is not a party to this appeal.

1

by Turkelson turned onto the road and struck the driver's side of Lindsey's vehicle. Multiple airbags deployed inside Lindsey's vehicle, and the side curtain airbag above the driver's side door hit Lindsey on the side of her face, her left ear, and the top of her head. Lindsey referred to the deployment of the airbags as an "explosion." After the accident, Spectrum Security arrived at the scene, and Lindsey reported that the sound in both of her ears was "very muffled" and that her left ear was "ringing."

Following the accident, Lindsey was examined in the emergency room where she reported experiencing sharp pain in her left ear, ringing in both ears, and a headache. She also reported pain in her left shoulder, lower back, left hip, and left rib cage.

Lindsey was subsequently referred to an audiologist, Pam Keenan at MacDonald Audiology on February 21, 2013. Keenan noted in her report that Lindsey's primary concern was sudden decrease in hearing and bilateral tinnitus. An audiogram test "revealed hearing to be within normal limits at 250-4000Hz with a slight dip at 6 and 8000Hz." Lindsey's word recognition was "Excellent bilaterally," and her speech recognition was in accordance with her other testing. The record reflects that Lindsey was administered various hearing tests that measured her ability to hear pure tones and speech. Keenan also noted that there was no previous audiogram to provide a comparison. Further testing at a March 19, 2013 visit to MacDonald Audiology yielded similar results. According to Lindsey, she was told by the audiologist that the airbag explosion caused the ringing in her ears.

On November 11, 2013, Lindsey visited the University of Michigan Health System and was seen by Dr. Katherine Heidenreich, a specialist in otology and neurotology who treated patients with ear disorders and hearing loss. According to Dr. Heidenreich's deposition testimony, Lindsey reported experiencing symptoms of hearing loss and tinnitus. Dr. Heidenreich explained tinnitus as being a "phantom sound that somebody perceives," which is "something that is inside your head that you hear, not from the environment." Dr. Heidenreich further explained that people experiencing tinnitus symptoms may describe the sound as ringing, a tone, or the sound of the ocean.

As part of Lindsey's examination that day, Dr. Heidenreich conducted a physical examination, which typically includes examining the patient's ears, nose, oral cavity, oral pharynx, and the cranial nerve function. The exam was "normal." Lindsey was also given an audiogram to test her hearing, and Dr. Heidenreich reviewed these results during the examination as well. Dr. Heidenreich testified that components of an audiogram required a patient to acknowledge whether or not the patient heard a sound that was presented to the patient, and Dr. Heidenreich acknowledged that this kind of testing relied on the patient "subjectively reporting what they heard." However, she testified that the testing also included "more objective components as well such as the movement of the eardrum and the acoustic reflexes." Based on the results of the audiogram administered to Lindsey that day, Dr. Heidenreich determined that Lindsey had "a mild high frequency sensorineural hearing loss in both ears but with excellent word recognition scores." Dr. Heidenreich testified that sensorineural hearing loss suggests problems with the inner ear or nerve. With respect to tinnitus, Dr. Heidenreich explained that this is a symptom that is often reported by people experiencing hearing loss and that there typically are not objective measures that can verify the existence of this symptom. Dr. Heidenreich also determined that Lindsey had "an acoustic reflex abnormality." The acoustic

2

reflex "measures the contraction of the stapedius muscle," and abnormalities can be associated with middle ear bone problems or tumors. According to Dr. Heidenreich, an acoustic reflex abnormality might not cause any symptoms, and this particular finding might not have had any bearing on Lindsey's condition.

Dr. Heidenreich testified that the literature includes reports of hearing loss and tinnitus following airbag deployment due to the sound generated. According to Dr. Heidenreich, it is possible for exposure to loud noises to cause hearing loss and tinnitus, even if an individual does not suffer physical trauma. Dr. Heidenreich opined that Lindsey's hearing issues were related to the car accident based on Lindsey's audiogram results and her history, which included her reports of experiencing an immediate decline in hearing, muffled hearing, and tinnitus right after the car accident in which the airbags deployed. Dr. Heidenreich opined that this history suggested that Lindsey had experienced a negative change in her hearing as compared to her pre-accident hearing capabilities and that Lindsey's exposure to the loud sound from the airbags could have caused her symptoms. However, Dr. Heidenreich acknowledged that there was no audiogram for Lindsey from before the accident for comparison and that hearing can deteriorate due to age. Additionally, Dr. Heidenreich indicated that she did not know the cause of the acoustic reflex abnormality.

Lindsey testified at her deposition that the pain and muffling in her ears started immediately after the automobile accident and that she did not have any of these symptoms before the automobile accident. At the time of her deposition, she no longer suffered from muffled hearing, but she did still have ringing or tingling in both of her ears. Lindsey indicated that her hearing loss was in her left ear. Lindsey testified that she generally did not have trouble hearing people speaking during normal conversation unless there was a lot of background noise, but she had trouble hearing whispering. Lindsey was told by both the audiologist and Dr. Heidenreich that the sound from the explosion of the airbag deploying near her ear caused her hearing problems.

According to Lindsey, her ear issues had a negative impact on her work because she was required to spend a significant amount of time in the car for work and the road noise made the ringing in her ears worse. She also testified that the ringing affected her ability to do her job because it was "distracting" and made her "very irritable." Places with large groups of people or loud sounds also made the ringing worse. Before the accident, Lindsey worked approximately 30 hours a week over the course of three days each week. At the time of her deposition, Lindsey was working one day a week for approximately eight hours because it was "harder to do the driving" and because she had small children.

Lindsey also testified during her deposition that before the accident, she had enjoyed outdoor activities such as kayaking, hiking, and bike riding. She also had a busy social life, enjoyed going to concerts, and liked to travel. Since the accident, Lindsey had been to two concerts, and they made the ringing in her ears worse. Lindsey also had not continued hiking or kayaking since the accident because she had tried these activities multiple times and found that it was "too quiet in the woods," which made the ringing more noticeable. Lindsey further testified that her ear problems had affected her ability to take care of her children because she was less patient, more irritable, and more anxious.

3

Lindsey's husband, Christian, testified at his deposition that he and Lindsey had experienced difficulties communicating since the accident because Lindsey would speak either too softly or too loudly. Lindsey would also occasionally tell Christian that she was having trouble hearing him. According to Christian, he sometimes had to ask Lindsey to repeat herself because he had a hard time understanding or hearing her, and she would get frustrated during these interactions because she was having a hard time knowing how loud she was talking. Christian further testified that there were times when Lindsey did not hear questions that their children asked her or misheard a question and responded with an answer that was unresponsive to the actual question. Christian also indicated that Lindsey was "more irritable" than before the car accident. Christian testified that Lindsey had indicated that she could not go on road trips or go to concerts with him because of her hearing issues. He also had to keep music at a quieter volume inside the house. Lindsey could watch television without a problem but going to movies gave her trouble.

Lindsey filed this action on July 10, 2015. Lindsey specified in her deposition that her claim of injury resulting from the automobile accident involved her hearing loss and ringing in her ears. Defendant Turkelson moved for summary disposition under MCR 2.116(C)(10), arguing that Lindsey did not suffer a serious impairment of body function and that any injury was not caused by the car accident. Defendants Auto-Owners Insurance Company and Home-Owners Insurance Company concurred in Turkelson's motion.

The trial court granted Turkelson's motion for summary disposition and dismissed the action in its entirety with respect to all defendants, ruling that there was no genuine issue of material fact regarding whether Lindsey suffered a serious impairment of body function. Specifically, the trial court concluded that Lindsey had "not shown any objective manifestation of her subjective complaints of tinnitus or otherwise demonstrated any physical basis for those complaints," that her hearing loss was "mild" and was "not a manifestation of or physical basis for tinnitus," and that there was "no indication that plaintiff's general ability to live her normal life is affected by that mild hearing loss." As a result of its determination on the threshold injury issue, the trial court specifically declined to make a ruling regarding Turkelson's causation argument. The trial court also stated that it would not address plaintiffs' counter-motion for summary disposition regarding the issue of fault "because summary disposition is proper regardless of fault for the underlying accident."

On appeal, plaintiffs argue that the trial court erred by concluding that her impairment was not objectively manifested and granting summary disposition on the ground that a serious impairment of body function had not been established.

## II. STANDARD OF REVIEW

"This Court reviews de novo a trial court's decision on a summary disposition motion to determine if the moving party was entitled to judgment as a matter of law." *Bergman v Cotanche*, 319 Mich App 10, 15; 899 NW2d 754 (2017). "In making this determination, the Court reviews the entire record to determine whether defendant was entitled to summary disposition." *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). "Courts are liberal in finding a factual dispute sufficient to withstand summary disposition." *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 476; 776 NW2d 398 (2009).

4

"A motion for summary disposition brought pursuant to MCR 2.116(C)(10) tests the factual support for a claim." *Id*. at 474-475. "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). A motion pursuant to MCR 2.116(C)(10) is reviewed "by considering the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West*, 469 Mich at 183. "[I]t is well settled that the circuit court may not weigh the evidence or make determinations of credibility when deciding a motion for summary disposition." *Innovative Adult Foster Care*, 285 Mich App at 480. Moreover, a court may not "make findings of fact; *if the evidence before it is conflicting*, summary disposition is improper." *Lysogorski v Bridgeport Charter Twp*, 256 Mich App 297, 299; 662 NW2d 108 (2003) (quotation marks and citation omitted).

## III. ANALYSIS

Tort liability is limited under the Michigan no-fault insurance act. *McCormick v Carrier*, 487 Mich 180, 189; 795 NW2d 517 (2010). However, a "person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, *serious impairment of body function*, or permanent serious disfigurement." MCL 500.3135(1) (emphasis added). The issue in the instant case is whether there is a genuine issue of material fact regarding whether Lindsey suffered a serious impairment of body function. The other two types of threshold injuries are not implicated here.

The term "serious impairment of body function" is defined by statute as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." MCL 500.3135(5). Under *McCormick*, the test for establishing a serious impairment of body function requires showing "(1) an objectively manifested impairment (2) of an important body function that (3) affects the person's general ability to lead his or her normal life." *McCormick*, 487 Mich at 195.

First, an objectively manifested impairment is one "that is evidenced by actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a body function." *Id*. at 196. The inquiry focuses on "whether the *impairment* is objectively manifested, not the *injury* or its symptoms." *Id*. at 197. Impairment means the state of (1) "being weakened, diminished, or damaged" or (2) "functioning poorly or inadequately." *Id*. (quotation marks and citation omitted). Although mere subjective complaints of pain and suffering are insufficient to show impairment, evidence of a physical basis for that pain and suffering may be introduced to show that the impairment is objectively manifested. *Id*. at 198. Medical testimony is generally, but not always, required to make this showing. *Id*.

Second, the important-body-function inquiry is "an inherently subjective" one. *Id*. at 199. The focus is on whether the body function "has great value, significant, or consequence," and the relationship of that function to the individual's life must be considered. *Id*. (quotation marks and citation omitted).

5

Third, the impairment to an important body function affects a person's general ability to lead a normal life if it has "an influence on some of the person's capacity to live in his or her normal manner of living." *Id*. at 202. This is also a subjective inquiry. *Id*. The statute does not require the person's ability to lead a normal life to have been destroyed or for the impairment to last a certain period of time. *Id*. at 202-203. The statute only requires that the impairment *affect* the person's *ability* to live in his or her normal manner of living. *Id*. at 202. The focus is not on whether a person's normal manner of living itself has been affected, and "there is no quantitative minimum as to the percentage of a person's normal manner of living that must be affected." *Id*. at 202-203.

However, the issue of whether a serious impairment of body function has been incurred is a question of law to be decided by the court only if (1) "[t]here is no factual dispute concerning the nature and extent of the person's injuries" or (2) "[t]here is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination whether the person has suffered a serious impairment of body function." MCL 500.3135(2)(a)(*i*) and (*ii*). Accordingly, in *McCormick*, 487 Mich at 215, our Supreme Court instructed courts applying MCL 500.3135 to begin by determining "whether there is a factual dispute regarding the nature and the extent of the person's injuries, and, if so, whether the dispute is material to determining whether the serious impairment of body function threshold is met." When there is a genuine issue of material fact regarding the nature and extent of a person's injuries, the threshold question of whether there was a serious impairment of body function is for the jury and may not be decided as a matter of law. *Chouman v Home Owners Ins Co*, 293 Mich App 434, 444; 810 NW2d 88 (2011).

## A. PLAINTIFF'S HEARING LOSS CONSTITUTES AN OBJECTIVELY MANIFESTED IMPAIRMENT.

On their motions for summary disposition, defendants argued that Lindsey's hearing loss does not constitute an objectively manifested impairment. The trial court agreed. We disagree.

Review of the record evidence submitted in this matter reveals that Lindsey complained of problems related to hearing loss and ringing in her ears immediately following the car accident and that Dr. Heidenreich determined that Lindsey had mild high frequency sensorineural hearing loss in both ears and an acoustic reflex abnormality. Lindsey's hearing loss was documented in the results of audiograms that tested her hearing as part of her evaluations by audiologist Keenan and Dr. Heidenreich. Defendants argue, and the trial court seemingly agreed, that because there exists a subjective component to the hearing tests, namely that Lindsey must indicate when she hears a particular sound, Dr. Heidenreich's conclusions were not evidence of an objectively manifested impairment. Rather, defendants contend, the testing which revealed hearing loss was dependent on the subjective verifications of Lindsey and thus, her hearing loss does not constitute an objectively manifested impairment. However, the fact that there exists a subjective component to the hearing test does not negate a finding that Lindsey's hearing loss is an objectively manifested impairment. Additionally, the record also reveals that in addition to Keenan and Dr. Heidenreich's findings, Lindsey's husband, Christian, testified that Lindsey had difficulties after the accident with speaking too softly or too loudly, which made it hard for him to understand her. Christian observed Lindsey experiencing frustration over her own lack of awareness about the volume of her voice. Christian also

6

testified that Lindsey sometimes did not hear questions that were asked of her and that Lindsey sometimes responded to questions in a way that showed that she did not accurately hear the question. Based on his observations of his wife's actions, Christian testified that Lindsey was having difficulty hearing adequately in everyday situations. The evidence of Lindsey's medical evaluations and Christian's testimony supports finding that a question of fact exists as to whether Lindsey's hearing was impaired. This impairment to her hearing was observable by others, which would satisfy the standard for showing an "objectively manifested impairment." *McCormick*, 487 Mich at 196-198. "In other words, an 'objectively manifested' impairment is commonly understood as one observable or perceivable from actual symptoms or conditions." *Id.* at 196.)

Keenan, Dr. Heidenreich and Christian testified as to *their* observations. All three testified that Lindsey suffered a hearing loss. Additionally, Lindsay testified that her hearing was muffled after the accident[3] and that she suffered from tinnitus. Dr. Heidenreich testified that while it is not possible to test for tinnitus, both symptoms Lindsey complained of are consistent with air bag explosions. Hence, examination of the entirety of the record in the light most favorable to plaintiff plainly reveals that Lindsey's complained of symptoms and conditions were observed and perceived by Keenan and Dr. Heidenreich's testing as well as the testimony of Christian. Consequently, plaintiff has demonstrated, in accord with *McCormick*, that there is a physical basis for her complaints. See, *McCormick*, 487 Mich at 198.

Moreover, contrary to its role in deciding a motion under MCR 2.116(C)(10), the trial court weighed the evidence. While testing a person's hearing necessarily involves self-reporting by the person being tested, the record reflects that this testing also includes objective components (such as examining the movement of the eardrum and acoustic reflexes) and is relied on by medical professionals. Both Keenan and Dr. Heidenreich examined Lindsey and considered her audiogram results, and they drew conclusions about the condition of her hearing based on their medical findings. The fact that Dr. Heidenreich used the word "subjective" in describing this self-reporting process does not completely negate the significance of her determinations. Nor does Dr. Heidenreich's description of ringing in the ears as the hearing of a "phantom" sound dispositively affect the analysis: her description illustrates the entire problem that a person with this symptom experiences—hearing a sound that is not heard by anybody else because it is not generated in the external environment. According to Dr. Heidenreich, tinnitus is a symptom commonly experienced by people with hearing loss. The words used by Dr. Heidenreich in her explanations cannot be used out of context to render Lindsey's claimed hearing impairment nonexistent as a matter of law. Yet the trial court essentially focused on these two words, to the exclusion of all the other evidence in the record, as providing dispositive proof that Lindsey's hearing problems were somehow a figment of her imagination. As previously discussed, Lindsey's hearing issues manifested themselves in ways that were observable by Christian and documented by medical professionals, and the record contains evidence of these medical findings. Lindsey clearly was not making unverifiable, subjective complaints of mere pain and suffering. Rather, she provided evidence which if believed would establish a physical basis for

---

[3] It is unclear from this record whether Lindsey's hearing is still, as she described it, "muffled."

her complaints. See *McCormick*, 487 Mich at 198. In sum, an injury is an "objectively manifested impairment" if it is "commonly understood as one observable or perceivable from actual symptoms or conditions." *Id*. at 196. Here, Lindsey produced evidence from medical professionals and others that create questions of fact as to the nature and extent of her impairment she alleges arose from her car accident. The fact that some subjective testing methods are incorporated into these medical findings does not negate her impairment as being an objectively manifested impairment. Rather, the trial court erred by failing to follow the factors set forth in *McCormick* when deciding whether Lindsey's impairment is objectively manifested. Additionally, the trial court erred by making its own evaluations regarding the persuasiveness of the medical evidence related to Lindsey's hearing. *Innovative Adult Foster Care*, 285 Mich App at 480. Accordingly, reversal of the trial court's ruling on this issue is warranted.

## B. HEARING IS AN IMPORTANT BODY FUNCTION.

"If there is an objectively manifested impairment of body function, the next question is whether the impaired body function is 'important." *McCormick*, 487 Mich at 198. As stated in *McCormick*:

> The relevant definition of the adjective "important" is "[m]arked by or having great value, significance, or consequence." *The American Heritage Dictionary, Second College Edition* (1982). See also *Random House Webster's Unabridged Dictionary* (1998), defining "important" in relevant part as "of much or great significance or consequence," "mattering much," or "prominent or large." Whether a body function has great "value," "significance," or "consequence" will vary depending on the person. Therefore, this prong is an inherently subjective inquiry that must be decided on a case-by-case basis, because what may seem to be a trivial body function for most people may be subjectively important to some, depending on the relationship of that function to the person's life. [487 Mich at 199.]

On appeal, neither party disputes that hearing is a body function that has "great value," especially to someone who enjoys going to concerts like Lindsey did. Neither party raised an issue relative to whether hearing constitutes an important body function, nor did the trial court address this issue. We therefore turn to the third prong in the McCormick factors to determine if a question of fact exists relative to whether Lindsey's hearing loss affects her general ability to lead a normal life.

## C. QUESTIONS OF FACT EXIST AS TO WHETHER PLAINTIFF'S HEARING LOSS AFFECTS HER GENERAL ABILITY TO LEAD A NORMAL LIFE.

As stated in *McCormick*, 487 Mich at 200-201, the test utilized to determine whether the impairment affects the person's general ability to lead their normal life is:

> [I]f the injured person has suffered an objectively manifested impairment of body function, and that body function is important to that person, then the court must determine whether the impairment "affects the person's general ability to lead his

8

or her normal life." The common meaning of this phrase is expressed by the unambiguous statutory language, and its interpretation is aided by reference to a dictionary, reading the phrase within its statutory context, and limited reference to *Cassidy*.

To begin with, the verb "affect" is defined as "[t]o have an influence on; bring about a change in." *The American Heritage Dictionary, Second College Edition* (1982). An "ability" is "[t]he quality of being able to do something," *id.*, and "able" is defined as "having sufficient power, skill, or resources to accomplish an object," *Merriam-Webster Online Dictionary*, <http://www.merriam-webster.com> (accessed May 27, 2010). The adjective "general" means:

1.  Relating to, concerned with, or applicable to the whole or every member of a class or category. 2. Affecting or characteristic of the majority of those involved; prevalent: *a general discontent.* 3. Being usually the case; true or applicable in most instances but not all. 4. a. Not limited in scope, area, or application: *as a general rule.* b. Not limited to one class of things: *general studies.* 5. Involving only the main features of something rather than details or particulars. 6. Highest or superior in rank." [*The American Heritage Dictionary, Second College Edition* (1982).]

MCL 500.3135 defines a "serious impairment of body function" as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." MCL 500.3135(7). The Legislature also expressly provided that whether a serious impairment of body function has occurred is a "question[] of law" for the court to decide unless there is a factual dispute regarding the nature and extent of injury and the dispute is relevant to deciding whether the standard is met. MCL 500.3135(2)(a). *McCormick*, 487 Mich at 190-191. In this case, the trial court erred by deciding whether a serious impairment has occurred because a factual dispute exists regarding the nature and extent of the injury.

Our Supreme Court stated in *McCormick*, 487 Mich at 202, that "the plain text of the statute . . . demonstrate[s] that the common understanding of to 'affect the person's ability to lead his or her normal life' is to have an influence on some of the person's capacity to live in his or her normal manner of living . . . [which] requires a subjective, person-and fact-specific inquiry that must be decided on a case-by-case basis." In order to make such a determination, we compare the plaintiff's life before and after the incident.[4]

---

[4] This method of analysis purposefully differs from that employed by the trial court. The trial court seemed to quantify the impairment, calling it "mild" and "only in one ear," despite the specific instruction in *McCormick* that: "there is no quantitative minimum as to the percentage of a person's normal manner of living that must be affected."

There was record evidence to support a finding that Lindsey's symptoms of hearing loss influenced her ability to live in her normal manner of living: she had trouble communicating with her family, and her tinnitus made it difficult to drive for long periods as required by her work, to attend concerts, and to engage in the outdoor activities that she enjoyed before the accident. We also note that the record reveals Lindsey could still hear normal conversation and that some of her hearing issues, such as her complaints of muffled hearing, may have been resolved. Dr. Heidenreich testified that Lindsey reported that her tinnitus was less intrusive while she was concentrating on caring for her young baby. Additionally, although Dr. Heidenreich testified that Lindsey had hearing loss in both ears, Lindsey testified that she noticed the loss of hearing in her left ear. There was also testimony that Lindsey had still participated in many of the activities that she enjoyed before the accident, even though she sometimes experienced heightened ringing in her ears afterward.

Based on this record evidence, we conclude there was conflicting evidence directly related to determining whether Lindsey's claimed injury qualified as a serious impairment of body function. Based on this conflicting evidence, there was a genuine issue of fact regarding the nature and extent of the impairment to Lindsey's hearing and that was material to the threshold injury determination; thus, the trial court erred by ruling on this question as a matter of law and granting summary disposition in favor of defendants. *McCormick*, 487 Mich at 215; *Chouman*, 293 Mich App at 444; *Lysogorski*, 256 Mich App at 299. Accordingly, reversal is warranted on this issue.

## D. CAUSATION.

Although the trial court did not rule on defendants' causation arguments, defendants argue on appeal (1) that a plaintiff must still show under *McCormick* that the alleged impairment was caused by the motor vehicle accident and (2) that plaintiffs failed to establish that Lindsey suffered an objectively manifested impairment related to her ears that was caused by the car accident. To the extent that defendants' argument implicates the issue of causation, we find it necessary to address this issue because of the possibility that defendants could be entitled to have the trial court's ruling affirmed on alternate grounds if defendants were correct. See *Adell Broadcasting Corp v Apex Media Sales*, 269 Mich App 6, 12; 708 NW2d 778 (2005) (stating that a trial court's ruling granting summary disposition may be affirmed on an alternate ground that was not decided by the trial court if the issue was presented to the trial court).

Proximate causation is a required element of a negligence claim. *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011). Causation is an issue that is typically reserved for the trier of fact unless there is no dispute of material fact. *Holton v A+ Ins Assoc, Inc*, 255 Mich App 318, 326; 661 NW2d 248 (2003).

"To establish proximate cause, the plaintiff must prove the existence of both cause in fact and legal cause." *Weymers v Khera*, 454 Mich 639, 647; 563 NW2d 647 (1997). While the term "proximate cause" is also a term of art for the concept of legal causation, Michigan Courts have historically used the term proximate cause "both as a broader term referring to factual causation and legal causation together and as a narrower term referring only to legal causation." *Ray v Swager*, 501 Mich 52, 63; 903 NW2d 366 (2017). However, in *Ray*, the Michigan Supreme Court explained that "[a]ll this broader characterization recognizes . . . is that a court must find

10

that the defendant's negligence was a cause in fact of the plaintiff's injuries before it can hold that the defendant's negligence was the proximate or legal cause of those injuries." *Id*. at 63-64 (quotation marks and citation omitted). The *Ray* Court also reiterated that " '[p]roximate cause' has for a hundred years in this state, and elsewhere, been a legal term of art; one's actions cannot be *a* or *the* 'proximate cause' without being both a factual and a legal cause of the plaintiff's injuries." *Id*. at 83.

Establishing cause in fact requires the plaintiff to "present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Id*. at 647-648 (quotation marks and citation omitted). Although causation cannot be established by mere speculation, see *id*. at 648, a plaintiff's evidence of causation is sufficient at the summary disposition stage to create a question of fact for the jury "if it establishes a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support." *Wilson v Alpena Co Rd Comm*, 263 Mich App 141, 150; 687 NW2d 380 (2004) (quotation marks and citation omitted).

"To establish legal cause, the plaintiff must show that it was foreseeable that the defendant's conduct may create a risk of harm to the victim, and . . . [that] the result of that conduct and intervening causes were foreseeable." *Weymers*, 454 Mich at 648 (quotation marks and citation omitted; alterations in original). Our inquiry "normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Campbell v Kovich*, 273 Mich App 227, 232; 731 NW2d 112 (2006) (quotation marks and citation omitted). "The general rule, expressed in terms of damages, and long followed in this State, is that in a tort action, the tort-feasor is liable for all injuries resulting directly from his wrongful act, whether foreseeable or not, provided the damages are the legal and natural consequences of the wrongful act, and are such as, according to common experience and the usual course of events, might reasonably have been anticipated." *Sutter v Biggs*, 377 Mich 80, 86; 139 NW2d 684 (1966). When judging the foreseeability of a risk of harm, "[i]t is not necessary that the manner in which a person might suffer injury should be foreseen or anticipated in specific detail." *Clumfoot v St Clair Tunnel Co*, 221 Mich 113, 116-117; 190 NW 759 (1922).[5] In other words, "[w]here an act is negligent, to render it the proximate cause, it is not necessary that the one committing it might have foreseen the particular consequence or injury, or the particular manner in which it occurred, if by the exercise of reasonable care it might have been anticipated that some injury might occur." *Baker v Mich Central R Co*, 169 Mich 609, 618-619; 135 NW 937 (1912).

---

[5] Although the *Clumfoot* Court was discussing the concept of foreseeability in the context of examining the duty element of a negligence claim, this Court has recognized that "[t]he question of proximate cause, like duty, depends in part on foreseeability," *Ross v Glaser*, 220 Mich App 183, 192; 559 NW2d 331 (1996).

Similarly, 2 Restatement Torts, 2d, § 435, p 449 states:[6]

> (1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

> (2) The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.

Comment a to 2 Restatement Torts, 2d, § 435, pp 449-450 further explains in pertinent part as follows:

> The fact that the actor, at the time of his negligent conduct, neither realized nor should have realized that it might cause harm to another of the particular kind or in the particular manner in which the harm has in fact occurred, is not of itself sufficient to prevent him from being liable for the other's harm if his conduct was negligent toward the other and was a substantial factor in bringing about the harm. . . .

> Negligent conduct may result in unforeseeable harm to another, (1) because the actor neither knows nor should know of the situation upon which his negligence operates, or (2) because a second force the operation of which he had no reason to anticipate has been a contributing cause in bringing about the harm. In neither case does the unforeseeable nature of the event necessarily prevent the actor's liability.

Here, the record reflects that there was no audiogram from before the accident to show Lindsey's pre-accident hearing capabilities, and Dr. Heidenreich testified that hearing loss can occur as part of the aging process. However, Lindsey testified that she began experiencing hearing problems and ringing in her ears immediately following the accident, and Lindsey further testified that she did not have these issues before the accident. Additionally, Dr. Heidenreich testified that there were studies in the literature showing a connection between the loud sounds of airbag deployment and hearing loss, and that exposure to loud sounds could cause hearing loss and tinnitus even if there has been no physical trauma. Dr. Heidenreich also opined that based on Lindsey's audiogram results and her history of experiencing an immediate negative

---

[6] We acknowledge that the Restatement is persuasive authority. See *Rowe v Montgomery Ward & Co, Inc*, 437 Mich 627, 652; 473 NW2d 268 (1991). However, we have located no Michigan cases expressly adopting or rejecting this section of the Restatement, and it is in accord with the jurisprudence of this state as expressed in the rules cited above from *Sutter*, *Clumfoot*, and *Baker*. Therefore, we find this principle expressed in the Restatement and accompanying comments to be persuasive.

change in her hearing following the accident, Lindsey's hearing loss and tinnitus were caused by her exposure to the loud sound of the airbags deploying. Based on the above evidence, a jury could reasonably conclude that, more likely than not, Lindsey's hearing loss would not have occurred but for the car accident because she did not have any problems with her hearing before the accident, was exposed to the loud sound of the airbags deploying in the accident, and then experienced sudden and persistent hearing loss immediately following the accident. Therefore, although it is possible that Lindsey's hearing loss was due to aging, plaintiffs presented evidence demonstrating a logical sequence of cause and effect sufficient to create a genuine issue of material fact regarding cause in fact. *Weymers*, 454 Mich at 647-648; *Wilson*, 263 Mich App at 150.

Additionally, injuries of various kinds, including injuries involving the head, are obviously a foreseeable result of negligently causing a motor vehicle accident. Although hearing damage may not be the first injury that might be expected to occur in a car accident, it is foreseeable that airbags may deploy during a crash and that a great deal of force and sound will be involved as the airbags must deploy quickly. Therefore, negligently causing a car accident may be considered a legal cause of hearing damage from the sound of the airbags deploying, even if this particular type of injury was not actually anticipated by Turkelson in the instant case. *Sutter*, 377 Mich at 86; *Baker*, 169 Mich at 618-619; 2 Restatement Torts, 2d, § 435, p 449.

Therefore, summary disposition also could not have been properly granted on causation grounds because there was a genuine issue of material fact on the current record regarding both the cause in fact and the legal cause of Lindsey's hearing loss. *West*, 469 Mich at 183; *Weymers*, 454 Mich at 647.

Reversed and remanded for further proceedings consistent with this opinion. Plaintiff, having prevailed, may tax costs. MCR 7.219(A). We do not retain jurisdiction.


/s/ Stephen L. Borrello
/s/ Patrick M. Meter
/s/ Mark T. Boonstra

13