*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARSHA HARSH, Personal Representative of the
ESTATE OF RYAN HARSH,

      Plaintiff-Appellant,

v

MCLAREN PORT HURON HOSPITAL,
ARUNDHUTI BANERJEE, M.D., and
ARUNDHUTI BANERJEE, M.D. PC,

      Defendants-Appellees,

and

FREDERICK WILLIAM COOP, M.D. and X-RAY
ASSOCIATES OF PORT HURON PC,

      Defendants.

UNPUBLISHED
June 20, 2025
1:44 PM

Nos. 366392; 367927
St. Clair Circuit Court
LC No. 19-001139-NH

MARSHA HARSH, Personal Representative of the
ESTATE OF RYAN HARSH,

      Plaintiff-Appellant,

v

MCLAREN PORT HURON HOSPITAL,
FREDERICK WILLIAM COOP, M.D., and X-RAY
ASSOCIATES OF PORT HURON, PC,

      Defendants,

and

No. 366953
St. Clair Circuit Court
LC No. 19-001139-NH

-1-

ARUNDHUTI BANERJEE, M.D. and
ARUNDHUTI BANERJEE, M.D. PC,

Defendants-Appellees.

Before: MALDONADO, P.J., and M. J. KELLY and RIORDAN, JJ.

PER CURIAM.

In this medical malpractice action, plaintiff appeals by leave granted and as of right the trial court's orders granting summary disposition to defendants McLaren Port Huron Hospital (McLaren), Arundhuti Banerjee, M.D. and Arundhuti Banerjee, M.D., P.C.[1] The trial court dismissed plaintiff's claims on the ground that she failed to create a genuine issue of material fact regarding whether Dr. Banerjee's alleged negligence proximately caused the death of plaintiff's decedent, Ryan Harsh. After careful review of the evidence in the light most favorable to plaintiff, we conclude that the trial court erred. Accordingly, we reverse the orders of the trial court and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

In May 2014, Harsh, a 36-year old autistic individual, lived with his mother, plaintiff. On the morning of May 25, 2024, Ryan experienced "seizure" activity and fell in his home. Plaintiff called 911 at 7:53 a.m., and emergency medical services (EMS) transported Ryan to McLaren where he arrived at 8:29 a.m. EMS technicians noted that Ryan was alert but combative. At McLaren, Christopher Hunt, M.D., a specialist in emergency medicine, evaluated Ryan and found him to have an "altered mental status." Dr. Hunt ordered a computed tomography (CT) scan of the brain without contrast. At 10:34 a.m., defendant Frederick William Coop, M.D., a radiologist, interpreted the CT scan ordered by Dr. Hunt. Dr. Coop included the following observations in his report:

> FINDINGS: The study is compromised by motion artifact in spite of multiple attempts to obtain non-motion images.

> Central structures are midline. There is no evidence of hydrocephalus. There is an area of decreased attenuation in the posterior left parietal region. This is not well visualized. There is no evidence of mass effect or midline shift. I do not see evidence of intracranial blood.

Notably, as part of his "Impressions," Dr. Coop recommended that a repeat CT scan be performed with Ryan sedated. Dr. Hunt treated Ryan in the emergency department until approximately noon

---

[1] This Court consolidated this appeal by right with two previous appeals by leave granted. *Estate of Ryan Harsh v McLaren Port Huron Hosp*, unpublished order of the Court of Appeals, entered July 16, 2024 (Docket Nos. 366392, 366953, and 367927).

on May 25, 2014. Regarding the CT scan, Dr. Hunt noted: "CT shows some attenuation in the parietal region on the right but could be motion artifact."

Ryan was transferred from the emergency department and admitted into the medical floor under the care of Dr. Banerjee, an internal medicine physician. Dr. Banerjee requested a neurology consultation which neurologist Marwan Shuayto, M.D., received at 12:43 p.m. Dr. Shuayto evaluated Ryan sometime before 2:36 p.m. According to Dr. Shuayto's progress notes, he ordered a repeat CT scan, however, it is unclear from the record when the order was made. But it is clear that sometime on May 26, 2014, attempts were made to repeat the scan, but a scan was not done because "the patient was very restless." Then on either the late afternoon or early evening of May 26, 2014, Ryan was found unresponsive. A "code" was called and staff intubated Ryan.

After Ryan coded, a "stat" CT scan was performed with and without contrast. Dr. Coop interpreted the scan on May 26, 2014, at 6:13 p.m. and found a "large right MCA [middle cerebral artery] infarct with associated mass effect and 8 mm of sub-falcine shift towards the left." In her progress note, Dr. Banerjee succinctly summarized Ryan's hospital course: "[P]atient was initially admitted with a right parietal stroke. Patient then had a second stroke on the right middle cerebral artery which caused subfalcine shift." Neurological examinations on both May 27, 2014, and May 28, 2014, confirmed that Ryan had no brain stem activity. Accordingly, he was diagnosed as experiencing "brain death." Ryan was pronounced dead on May 29, 2014, at 1:15 p.m.

Plaintiff filed a medical malpractice wrongful-death action, naming as defendants McLaren, Dr. Banerjee, Dr. Coop, and the individual doctors' professional corporations. In essence, plaintiff alleged that defendants failed to properly recognize, diagnose, and treat Ryan's stroke events. Liability of McLaren was based on direct negligence for improper supervision and training and vicarious liability for the negligence of Drs. Banerjee and Coop.[2]

Defendants deposed Dr. Chitra Venkatasubramanian (Dr. Venkat),[3] one of plaintiff's causation experts. Generally, Dr. Venkat opined that Ryan had a clot that was not recognized in his right middle cerebral artery and, because it was not recognized, it was not timely treated. Dr. Venkat further opined, among other things, that if Dr. Banerjee had ensured that a repeat CT scan had been performed, the scan would have revealed the right middle cerebral artery hemispheric infarct, Ryan would have been started on hyperosmotic therapy, and a neurosurgeon would have performed a hemicraniectomy. Ultimately, Dr. Venkat opined that Ryan's death was avoidable.

McLaren moved for summary disposition under MCR 2.116(C)(10) arguing, among other things, that plaintiff failed to present evidence creating a genuine issue of fact regarding causation. McLaren argued that Dr. Venkat's opinions were based on speculation. In response, plaintiff asserted that sufficient evidence was presented to give rise to a question of fact regarding whether Ryan's death, more probably than not, was proximately caused by Dr. Banerjee's negligence.

---

[2] Plaintiff settled all claims against Dr. Coop and his professional corporation, defendant X-Ray Associates of Port Huron, P.C. Accordingly, these defendants are not parties to the appeals.

[3] In the trial court, the parties referred to Dr. Venkatasubramanian as "Dr. Venkat." We will continue with this convention on appeal.

Plaintiff argued, "Dr. Venkat's testimony plainly supports that had Defendants complied with the standard of care by properly documenting the interpretation of the original CT scan performed and ensuring that a follow-up CT scan was obtained, Mr. Harsh would have received the treatment he needed to prevent his full cardiac arrest and death." Dr. Banerjee and her professional corporation concurred in McLaren's motions and, later, filed their own motion on identical grounds.

After hearings on the parties' motions, the court found that there existed no genuine issue of material fact related to causation and it characterized Dr. Venkat's opinions in this regard as speculative. These appeals followed.

## II. DISCUSSION

Plaintiff argues that the trial court erred in granting summary disposition to McLaren, Dr. Banerjee, and Arundhuti Banerjee, M.D. PC. Plaintiff contends that she demonstrated a genuine issue of material fact on the causation element of her malpractice claims. We agree.

This Court reviews de novo a trial court's decision to grant or deny a motion for summary disposition. *Sherman v St Joseph*, 332 Mich App 626, 632; 957 NW2d 838 (2020). A motion for summary disposition under MCR 2.116(C)(10) tests the factual support for the plaintiff's claims. *Anderson v Transdev Servs, Inc*, 341 Mich App 501, 506; 991 NW2d 230 (2022). Summary disposition is appropriate under MCR 2.116(C)(10) when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). In reviewing such a motion, a court considers the pleadings, affidavits, depositions, admissions, and other evidence in the light most favorable to the nonmoving party. *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018). A genuine issue of material fact exists when the record leaves open an issue on which reasonable minds could differ. *Id.* A trial court may not weigh the evidence, make findings of fact, or make credibility determinations when deciding a motion for summary disposition. *Id.* If there is conflicting evidence before the trial court, summary disposition is not proper. *Id.*

The plaintiff in a medical malpractice action bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. *Landin v Healthsource Saginaw, Inc.*, 305 Mich App 519, 533; 854 NW2d 152 (2014). See also MCL 600.2912a (codifying these common-law elements). Failure to establish any one of the four elements is fatal to a plaintiff's medical malpractice suit. *Benigni v Alsawah,* 343 Mich App 200, 213; 996 NW2d 821 (2022).

"Proximate cause" is a term of art that encompasses both cause in fact and legal cause. *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004). "The cause in fact element generally requires showing that "but for" the defendant's actions, the plaintiff's injury would not have occurred." *Id*. at 86-87 (quotation marks and citation omitted). By contrast, "legal cause" typically involves considering the foreseeability of consequences and whether a defendant should be held legally responsible for such consequences. *Id*. at 87. A plaintiff is not required to show that a defendant's act or omission was the sole cause of her injuries, but she must introduce evidence permitting the jury to conclude that the defendant's act or omission was *a* cause. *Id.*

Cause in fact, the proximate cause concept at issue in this appeal, "may be established by circumstantial evidence, but such proof must be subject to reasonable inferences, not mere speculation." *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 496, 668 NW2d 402 (2003). In a medical malpractice action, expert testimony is essential to establishing a causal link between the alleged negligence and the alleged injury. *Pennington v Longabaugh*, 271 Mich App 101, 104; 719 NW2d 616 (2006). However, "an expert opinion based upon only hypothetical situations is not enough to demonstrate a legitimate causal connection." *Teal v Prasad*, 283 Mich App 384, 394; 772 NW2d 57 (2009). Instead, a plaintiff establishes that the defendant's conduct was a cause in fact of her injuries only if she "sets forth specific facts that would support a reasonable inference of a logical sequence of cause and effect." *Craig*, 471 Mich at 87 (quotation marks, citation, and brackets omitted). Accordingly, a valid theory of causation must be based on facts in evidence. *Id.*

Summary disposition is not appropriate when the plaintiff offers evidence that shows "that it is more likely than not that but for defendant's conduct, a different result would have been obtained." *Dykes v William Beaumont Hosp*, 246 Mich App 471, 479 n 7; 633 NW2d 440 (2001). Moreover, "proximate cause is a question for the jury to decide unless reasonable minds could not differ regarding the issue." *Lockridge v Oakwood Hosp*, 285 Mich App 678, 684; 777 NW2d 511 (2009).

Plaintiff claims that malpractice on the part of Dr. Banerjee ultimately led to Ryan's death because the malpractice delayed Ryan receiving critical neurological evaluation and life-saving treatment. In support of this contention, plaintiff relied on the testimony of her neurological causation expert, Dr. Venkat. The trial court concluded that the opinions of Dr. Venkat were based on mere speculation that certain events would have transpired had Dr. Banerjee promptly ensured that the repeat CT scan occurred. We disagree with the trial court's conclusion. We acknowledge that to meet the burden of establishing a genuine issue of material fact, a party opposing summary disposition must do more than provide conjecture and speculation. See *Wiley*, 257 Mich App at 496. A mere possibility that a claim might be supported by the evidence is insufficient. *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999). However, a careful review of Dr. Venkat's testimony establishes that her opinions were not mere speculation, but were based on her experience and facts in evidence that supported her opinion. That is, Dr. Venkat's testimony established a causal connection between Dr. Banerjee's actions and Ryan's death. At the very least, the expert's testimony was sufficient to give rise to a question of fact regarding whether Dr. Banerjee's alleged negligence, more probably than not, caused Ryan's death.

In general, Dr. Venkat's opinions started with the proposition that Dr. Banerjee should have ensured that the repeat CT scan be promptly and timely performed. Dr. Venkat opined that since Ryan was admitted to a hospital floor under Dr. Banerjee's care, it was Dr. Banerjee's responsibility to see that the repeat CT scan was completed. Dr. Venkat further explained that Ryan's agitation was not an impediment to getting the repeat scan completed. Ryan could have been sufficiently sedated to repeat the study. Dr. Venkat opined that the repeat CT scan should have been done on May 25, 2014, after Ryan was transferred to a floor from the emergency department, or, at the latest, on the morning of May 26, 2014. According to Dr. Venkat, the repeat scan would have shown the damage to the brain that had been done from the unrecognized and untreated clot.

During her deposition, Dr. Venkat considered three treatment modalities that would have changed the outcome of the case. Dr. Venkat testified regarding medical management of the clots, a mechanical thrombectomy, and a decompressive craniectomy in conjunction with hyperosmolar therapy. Dr. Venkat further explained why some of the treatments became irrelevant or unavailable as time passed and Ryan's condition deteriorated.

Dr. Venkat testified that because the CT scan done on the morning of May 25, 2014, while Ryan was still in the emergency department, was suspicious for a stroke, Ryan was never a candidate for tPA, a medication used to dissolve blood clots. She next explained the mechanical thrombectomy option. Dr. Venkat testified that a mechanical thrombectomy involved using a mechanical device to retrieve a clot. In this regard, when asked what could have been done to prevent Ryan's deterioration in the hospital, Dr. Venkat testified:

> One is recognizing that there was a right middle cerebral artery hyperdense sign on the non-contrast CT by the radiologist, the radiologist conveying that information to the ER doctor and asking for performance of a CT angiogram stat. The CT angiogram would have showed the clot in the right middle cerebral artery, and if Mr. Harsh had been transferred to, I don't know if Port Huron has the capability or a neighboring facility has the capability to do mechanical thrombectomy, then that should have been done and that would have prevented the deterioration whereby Mr. Harsh went from moving his left side to not moving his left side, went from being able to speak a little bit to not being able to speak at all.

Dr. Venkat explained that these actions, specifically performing a mechanical thrombectomy, would have prevented the malignant cerebral edema and a massive right middle cerebral artery stroke.

Dr. Venkat explained that a CT angiogram in the emergency room would have shown the location of the clot and the need for a mechanical thrombectomy. However, once Ryan was transferred to the floor from the emergency department, the CT angiogram was no longer needed. Dr. Venkat explained that there was no reason for Dr. Banerjee or Dr. Shuayto to order a CT angiogram or MRI once Ryan was admitted from the emergency room to the hospital floor because Ryan "had extended his stroke prior to Dr. Shuayto seeing him. So there is no role for a CT angiogram at that time."

Dr. Venkat also testified that a mechanical thrombectomy, depending on the facility, could have been done by an interventional radiologist, a trained neurologist, or a trained neurosurgeon. When asked what was done in Michigan in 2014, Dr. Venkat testified:

> Oh, I believe it was being very widely done, you know, throughout the country and I don't think Michigan would have been an exception to that. I don't know all the hospitals in that area, but it was very routinely done.

When further asked if she knew of any hospital in Michigan that did mechanical thrombectomy in 2014, Dr. Venkat testified: "Like I said, you know, all academic centers were doing it. All major stroke centers were doing it." When asked if, as a neurologist treating a stroke patient, she referred

a patient to a neurosurgeon or an interventional radiologist for a mechanical thrombectomy, Dr. Venkat replied: "[Y]es. All the time."

According to Dr. Venkat's testimony, at a certain point in time, performing a mechanical thrombectomy was no longer an available option. Dr. Venkat agreed that by approximately noon or 12:30 p.m. on May 25, 2014, the pursuit of any kind of mechanical thrombectomy would have been futile because the stroke was complete by that time. Dr. Venkat then addressed the need to perform a craniotomy, to relieve the pressure on the brain, and to administer medications to reduce brain swelling. Dr. Venkat opined that if a follow-up CT scan had been performed, Dr. Shuayto, the consulting neurologist, would have requested the involvement of a neurosurgeon. Dr. Venkat testified:

> *Q*. And as I understand it, it's your opinion that if a follow-up CT scan had been done, Dr. Shuayto would have requested the involvement of a neurosurgeon?
>
> *A*. Correct.
>
> *Q*. And what would the CT scan have shown that would have prompted Dr. Shuayto to request the involvement of a neurosurgeon?
>
> *A*. It would have shown a large hemispheric infarct in the right middle cerebral artery territory. Decompressive craniectomy to allow space for that stroke to swell out is standard of care and was standard of care back then. Dr. Shuayto is not a neurosurgeon, thereby, he would have requested a neurosurgeon to get involved.
>
> *Q*. You do not do hemicraniectomies yourself; true?
>
> *A*. No. But I send patients to the neurosurgeons for hemicraniectomies.

Further, in Dr. Venkat's opinion, hemicraniectomies were widely done by neurosurgeons for patients like Ryan in 2014.

Dr. Venkat explained that "assuming the CT had been obtained by the internist, . . . it would have shown a hemispheric right middle cerebral artery stroke." She would have gotten a neurosurgeon involved, and while Ryan awaited surgery, Dr. Venkat would have started Ryan on hyperosmolar therapy. Hyperosmolar therapy involved administering medication to help attenuate the ongoing swelling in the brain.

Dr. Venkat's testimony also addressed how the performance of a hemicraniectomy would have affected the outcome. First, Dr. Venkat testified to the timing of the decompressive procedure:

> *Q*. At what point would a hemicraniectomy have to be performed in order to prevent the cardiac arrest Mr. Harsh suffered on May 26 at about 5:10 p.m.?
>
> *A*. . . . So going through the records, Mr. Harsh had clear signs of neurological decline throughout the night and into the morning of the 26th. His

heart rate started dropping . . . just before he went into cardiac arrest, so until about I would say 4:00 or 4:30 p.m. there was ample time to do a hemicraniectomy and provide hyperosmolar therapy.

According to Dr. Venkat, a hemicraniectomy would have prevented Ryan's death because it would have allowed space for the brain to swell outside as opposed to swelling inside and pushing the brainstem.

Dr. Venkat opined that had the proper measures been taken, starting with Dr. Banerjee securing the repeat CT scan, Ryan would have survived:

> *Q.* As once the stroke was completed, would you agree that Mr. Harsh was going to end up with left-sided immobility and an inability to speak no matter what therapeutic measures were taken?
>
> *A.* Well, he would be alive and he would have weakness of the left side and difficulty speaking, yes.

Despite the foregoing testimony, the trial court concluded that Dr. Venkat's opinions were mere speculation. We conclude that the trial court erred in this regard, and it failed to view the evidence in the light most favorable to the plaintiff.

Dr. Venkat agreed that by the time Ryan was moved from the emergency department to a hospital floor, the pursuit of any kind of mechanical thrombectomy would have been futile because the stroke was complete by that time. Thus, Dr. Venkat opined that had Dr. Banerjee ensured that the repeat CT scan had been performed, the consulting neurologist, Dr. Shuayto, would have consulted with a neurosurgeon, and a decompressive craniectomy with hyperosmolar therapy would have followed to save Ryan's life. This opinion was not based on mere conjecture. Dr. Venkat's opinion that Dr. Shuayto would have appreciated the need for a consultation with a neurosurgeon was not speculative. Dr. Venkat thoroughly explained that other treatment modalities like tPA to dissolve the clot or mechanical thrombectomy to remove one were no longer available options. Similarly, it was not conjecture for Dr. Venkat to opine that Dr. Shuayto, a neurologist, would have consulted with a neurosurgeon. Dr. Venkat testified neurosurgeons perform decompressive craniectomies and that in 2014, hemicraniectomies were widely done by neurosurgeons for patients like Ryan.

The trial court's conclusion that Dr. Venkat's opinion was speculative was based on a finding that Dr. Venkat knew nothing about McLaren's capabilities in 2014 or the capabilities or distances of other facilities in Michigan. The trial court reasoned that even if the repeat CT scan had occurred in a timely fashion, and the need for more neurological assessment and treatment was then obvious, it was still speculative whether Ryan would have received the life-saving treatments that he required. However, the court's findings illustrate that it failed to view the evidence in the light most favorable to the plaintiff. We acknowledge that with regard to mechanical thrombectomy, Dr. Venkat did not know if McLaren was equipped to perform one in 2014, how close the nearest center was to McLaren that could perform one, or how long it would have taken to transfer Ryan to a facility equipped to perform a mechanical thrombectomy. However, Dr. Venkat also testified that in 2014, mechanical thrombectomies were "very widely

done . . . throughout the country," including in Michigan, and that all academic centers and stroke centers were performing mechanical thrombectomies. Regarding, hemicraniectomies, Dr. Venkat opined that in 2014, this procedure was widely done by neurosurgeons for patients in Ryan circumstances. Viewing the evidence in the light most favorable to plaintiff, a question of fact existed with respect to whether a mechanical thrombectomy or hemicraniectomy would have been available to Ryan in a timely fashion had Dr. Banerjee ensured the repeat CT scan occurred.

Furthermore, the trial court ignored Dr. Venkat's opinion regarding the administration of hyperosmolar therapy that could have been ordered by Dr. Shuayto, the neurologist on staff at McLaren. When asked about initiating hyperosmolar therapy in conjunction with the craniectomy, Dr. Venkat explained:

> Again, if the CT scan had been done as requested, it would have shown a large hemispheric right middle cerebral artery stroke. Once the neurologist sees that stroke, hyperosmolar therapy is started because the natural course of large hemispheric strokes is to swell, and then if the swelling is not relieved or if that swelling is not mitigated by hyperosmolar therapy, the end result is brainstem compression and cardiac arrest, just like what Mr. Harsh had.

Dr. Venkat admitted that hyperosmolar therapy alone would not have prevented Ryan's death. But she further opined that the administration of the medication to mitigate the brain swelling would have bought Ryan additional time until a hemicraniectomy could be done.

On this record, we find that the trial court erred when it concluded that plaintiff failed to present sufficient evidence to give rise to a question of fact with regard to whether Ryan's death was more probably than not proximately caused by Dr. Banerjee's negligence. McLaren has not provided evidence to support its claim that it did not have the ability to provide the decompressive craniectomy or that had Ryan been transferred, he would not have received the needed treatment in time to prevent his death. By contrast, plaintiff provided expert testimony that there were several hours within which hyperosmolar therapy or a decompressive craniectomy could have been performed and that had the surgical procedure been performed to relieve the swelling and pressure on the brain, Ryan would have survived. The evidence supported a conclusion that it was more likely than not that Dr. Banerjee's failure to ensure that a repeat CT scan occurred was a cause of Ryan's death. The causal connection between Dr. Banerjee's actions and Ryan's death was not too attenuated to satisfy the but-for requirements. Rather, the record demonstrates that plaintiff set forth substantial specific facts to support a reasonable inference of a logical sequence of cause and effect. See *Craig,* 471 Mich App at 87. At the very least, a question of fact existed in this regard. Accordingly, the trial court erred by granting summary disposition in favor of McLaren and Dr. Banerjee.

### III. CONCLUSION

Given that plaintiff demonstrated a genuine issue of material fact regarding causation, and this matter is remanded for further proceedings, it is unnecessary to consider plaintiff's alternative argument that the trial court erred when it granted summary disposition in favor of Dr. Banerjee and Arundhuti Banerjee, M.D. PC. when those defendants did not initially file on their own behalf a motion for summary disposition, but instead, concurred in McLaren's motion.

Reversed and remanded for further proceedings.  We do not retain jurisdiction.

/s/ Allie Greenleaf Maldonado
/s/ Michael J. Kelly
/s/ Michael J. Riordan