*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARGIO CASTRO,

      Plaintiff-Appellant,

v

TODD RAYNAL DUESETTE and ERICA
SHAVONE DUESETTE,

      Defendants-Appellees.

UNPUBLISHED
June 4, 2019

No. 341695
Wayne Circuit Court
LC No. 16-014200-NI

Before: TUKEL, P.J., and SHAPIRO and GADOLA, JJ.

SHAPIRO, J. (*dissenting*).

I respectfully dissent. Plaintiff was injured in an automobile collision on November 24, 2013, and thereafter brought suit against the allegedly at-fault driver. The trial court dismissed the suit concluding that (1) there was no evidence that the collision was a cause of plaintiff's left shoulder rotator cuff tear or his left shoulder labral tear; and (2) that the alleged injury to the left shoulder did not affect plaintiff's ability to lead his normal life. My colleagues agree with the trial court on both counts. In my view, their conclusions are inconsistent with the record evidence and the bedrock principle that summary disposition under MCR 2.116(C)(10) is not to be granted when there is a question of material fact. Turning that basic principle on its head, the majority overlooks facts inconsistent with its conclusion, engages in speculation and draws all inferences in the moving party's favor. The majority opinion may serve as a good outline for the defendants' closing argument at trial, but it wholly fails to provide grounds for summary disposition.

## I. CAUSATION

The majority concludes that there is no evidence that the November 2013 accident was a cause of plaintiff's left shoulder full-thickness rotator cuff tear and labral tear. It reaches this conclusion despite the fact that the pre-accident imaging studies contained in the record do not show these injuries while post-accident imaging studies do, and despite the explicit conclusion of

an examining physician—selected and paid by an insurance company—that the accident was a cause of these injuries.[1]

The collision occurred on November 24, 2013, when a vehicle driven by defendant Todd Duesette and owned by defendant Eric Duesette struck the left side of plaintiff's car. Plaintiff began several months of physical therapy shortly thereafter. In the initial assessment sent to plaintiff's primary care physician, the therapist noted that "after careful examination, it appears that Mr. Castro is experiencing symptoms consistent with traumatic rotator cuff impingement . . . ." The examination revealed reduced range of motion in several planes of the left shoulder and "left shoulder impingement."

On February 13, 2014, at Allstate Insurance Company's request, plaintiff underwent an "Insurer Examination" including a functional abilities evaluation conducted by a physician and kinesiologist chosen by the insurer. He was found to have reduced left shoulder motion and muscle strength and a "positive apprehension sign," a finding that suggests a possible rotator cuff tear. In response to the insurer's questions, the physician's report stated that Mr. Castro's reported complaints correlated with "objective findings" and advised that "further investigation is required to rule out a left shoulder rotator cuff tear . . . ." The report went on to state that "[b]ased on his functional testing and physical examination," in the interim "he should avoid heavy lifting, above shoulder level activities, and repetitive reaching . . . ." (Quotation marks omitted). The examining doctor opined that "Mr. Castro is not capable of returning to his employment at this time."

As part of the insurer examination, on February 18, 2014, plaintiff was also examined by Dr. S.W. Bartol, an orthopedic specialist. In response to the insurer's questions concerning plaintiff's condition and its cause, Dr. Bartol stated that plaintiff "does have some functional limitations and physical restrictions at this time [and] evidence of ongoing impairment affecting the left upper extremity." He opined that plaintiff "is not capable of returning to his pre-accident employment at this time" and recommended that plaintiff's work duties be restricted to exclude heavy lifting or overhead work. Dr. Bartol also recommended an MRI (magnetic resonance imaging) and MRA (magnetic resonance arthrogram) of the left shoulder in order to determine the exact nature of the pathology.

The MRI report described the left rotator cuff as having a "high grade partial thickness tear" as well as "an inferior labral tear."[2] The MRA report revealed a "[f]ull thickness tear of

---

[1] The majority is less certain, however, as to what did cause the injuries, first suggesting that they pre-existed the accident, but then concluding that they occurred after the accident.

[2] According to WebMD, the labrum is a

> thick band of tissue surrounds your shoulder socket and keeps your shoulder joint stable. . . .

supraspinatus tendon with near complete thickness tear of the infraspinatus tendon [and an] [u]ndisplaced inferior labral tear."

Dr. Bartol again saw plaintiff at the insurer's request on September 9, 2016. He confirmed that the medical imaging showed both labral and rotator cuff tears. After examining plaintiff, he opined that "[p]rognosis with respect to the shoulder injury is poor. Further improvement is not expected without surgical intervention." He also stated that "[t]he current complaints are consistent with the mechanism of injury [i.e., the auto accident] and correlate with objective findings." He stated that as a result of the labral tear Mr. Castro "is not able to participate in normal work activities" and that "[h]e is not capable of working at his previous duties in an unrestricted fashion." Regarding the rotator cuff tear, he concluded that plaintiff had "pre-existing rotator cuff tendinopathy" in his left shoulder that "likely predisposed him to a full thickness tear in the left shoulder, . . . *the full thickness tear probably occurred at the time of the motor vehicle accident. The labral pathology in the left shoulder is, in my opinion, specifically attributable to the motor vehicle accident*." (Emphasis added).

The majority concedes that Dr. Bartol reached this conclusion and stated it in his written report. Inexplicably, however, the majority simply dismisses all of Dr. Bartol's conclusions by asserting that he was not aware of plaintiff's pre-accident left shoulder tendinopathy. The majority is mistaken, however, because, Dr. Bartol refers specifically to that pre-existing tendinopathy in his report. The majority then goes on to speculate that *if* Dr. Bartol was aware of plaintiff's pre-existing pathology he would completely change his opinion and conclude that the accident played no role in plaintiff's impairments. Notably, however, defendants did not obtain an affidavit from Dr. Bartol indicating that his opinion had changed or that he was unaware of the prior pathology. The majority merely assumes that upon learning of other information (that he appears to already have) Dr. Bartol would completely alter his opinion. This is at best an inference drawn in favor of the moving party and really amounts to nothing more than speculation. Given the standards that apply to a motion under 2.116(C)(10) it would seem necessary to have at least *some* evidence that Dr. Bartol no longer holds his stated opinions. Without it, the majority's assurance that Dr. Bartol will abandon his opinions appears to rest

---

Your shoulder has three bones: the scapula (shoulder blade), humerus (upper arm bone), and clavicle (collarbone). They work together in a ball-and-socket joint where the arm connects to your trunk.

Your shoulder's labrum isn't a bone. It's soft tissue that helps connect the socket part of the scapula (called the glenoid) with the head of the humerus. If the labrum tears, there's not enough cushion between those bones.

The article describes common symptoms of a labral tear as including: catching, locking, or grinding, an unstable feeling in the shoulder, a loss of strength and reduced range of motion. <https://www.webmd.com/pain-management/labrum-slap-tear#1> (accessed April 30, 2019).

solely on divination. The bottom line is that the *only* evidence before us of Dr. Bartol's opinion are his reports that clearly support plaintiff's claim.[3]

In addition, the majority obfuscates the medical record when it states prior to the accident, plaintiff suffered from "preexisting neck and shoulder conditions." That is true—the medical records show that plaintiff had complained in the past about "shoulder" problems. However, the records of his treating physicians reveal that the shoulder problems for which he saw his doctors were—on every occasion—of the *right* shoulder, not the *left* shoulder. In 2005, he saw his doctor for *right* shoulder pain and underwent several months of treatment; however, no problems were reported regarding the *left* shoulder. In 2007, an ultrasound revealed a partial tear in the *right* shoulder.[4] And the records of plaintiff's primary care doctors from 2000–2010 describe right shoulder problems, not left shoulder problems.

Having side-stepped Dr. Bartol's findings and opinions, the majority then inflates the content of a report from Dr. Mark Kwartowitz. Dr. Kwartowitz conducted an insurance medical examination in 2017. In his report he agreed that plaintiff has a left rotator cuff tear[5] with reduced range of motion and strength. His conclusion as to causation is very carefully worded. He did not conclude that the collision was not a cause of these injuries. Rather, he stated, "I cannot say with any degree of medical certainty that there is any evidence of distinct pathology introduced to Mr. Castro's Left Shoulder from the motor vehicle accident." He reached this non-conclusive double-negative based on his assertion that pre- and post-collision imaging revealed no change and because, as he stated, plaintiff had not revealed the pre-existing problems to him.

---

[3] The majority also attempts to sidestep this evidence by noting that the insurer examination concerned benefits determined under Ontario's Insurance Act. Putting aside the lack of evidence to support this statement, it is difficult to understand how diagnosis of an injury and opining as to its cause(s) is rendered meaningless because the insurance claim was governed by Canadian law.

[4] The medical records show rare left shoulder complaints prior to the accident. In 1998, plaintiff was injured in an auto accident and treated for some time for low back pain. Immediately after the accident plaintiff complained of a bruise on his left shoulder from the seat belt, but the records do not show any ongoing left shoulder complaints thereafter. Three years later, plaintiff came to see his doctor in early 2001 indicating that he had fallen and injured a shoulder, but the doctor's note does not indicate which shoulder. In any event, there are no records of any follow-up treatment for this injury. Indeed, when examined a year later, the physician noted that in both shoulders plaintiff had "full range of motion in all planes, no impingement, and excellent strength." Plaintiff was in another auto accident in January 2003. He again had a bruised left shoulder from the seat belt that was diagnosed as a "left shoulder girdle strain," but the injuries he reported to his doctor were: "sore neck, chest, lower back, knees." In 2005, plaintiff went to his doctor for *right* shoulder pain and right elbow pain. In 2007, he had an ultrasound of the *right* shoulder which revealed a suspected partial tear. In 2012, he was injured at work when he twisted his *right* shoulder. There are no further left shoulder complaints or treatment referred to in any of plaintiff's medical records from 2005 through 2013.

[5] Which by 2017 had begun to atrophy.

-4-

The first of these claims is clearly inaccurate and the second is dubious. The radiology records indicate that the first time plaintiff was ever imaged with a left labral tear was *after* the collision. As to the rotator cuff tear there is a question of fact. The majority refers to a 2004 MRI showing "[f]indings suggestive of tendinopathy . . . . A less likely consideration is a partial tear. There is no evidence of full thickness tear seen."

That plaintiff had a tendinopathy prior to the accident is neither new nor dispositive. Perhaps more to the point, reliance on this alleged 2004 MRI report as grounds to dismiss plaintiff's case is improper given that the actual report of such a study is not found anywhere in the record. The MRI is described in defendants' brief's statement of facts. However, in violation of briefing requirements,[6] no reference to the record or exhibits is provided. Dr. Kwartowitz states that he based his conclusion that there was a 2004 MRI from a statement referring to such a study in the report of chiropractor Dr. Jeffrey Middledorf who conducted an insurance examination following a 2003 accident. However, the study is not in the record before us. Moreover, Dr. Middledorf's own conclusion in 2004 was not consistent with the existence at that time of any serious shoulder pathology. Having reviewed the MRI, he opined that there was "no objective evidence clinically or radiographically of any residual injury to his spine or left shoulder from the January 1, 2003 accident."

In sum, there is substantial evidence that the labral tear to plaintiff's left shoulder was caused by the accident and no evidence that it occurred earlier. There are no references in any pre-accident medical records to even the possibility that plaintiff had such an injury. Dr. Bartol opined that plaintiff had significant rotator cuff pathology before the accident but that the full-thickness rotator cuff tear was the result of the accident. In response defendants cite only to Dr. Kwartowitz's conclusion that he cannot reach a conclusion.

No doubt defendants have fodder from which to dispute the cause of plaintiff's rotator cuff injury. However, to suggest that there is not a question of fact requires that we ignore virtually all the medical evidence in the case. Even assuming that plaintiff's left rotator cuff was already partially torn prior to the collision, it does not reduce, let alone eliminate, the role of the instant accident after which he was shown to have a full-thickness tear and a labral tear. Where there is a pre-existing condition, "the aggravation or triggering of a preexisting condition can constitute a compensable injury." *Fisher v Blankenship*, 286 Mich App 54, 63; 777 NW2d 469 (2009).

In addition to claiming that plaintiff's left shoulder problems were caused by events 10 or 15 years before the auto accident, the majority also asserts that the injury occurred after the accident, i.e., that the injuries were the result of an incident at work in April 2014. However, the majority overlooks that during the time after the collision in November 2013—but before the work incident in April 2014—plaintiff had been diagnosed with rotator cuff and labral tears, had received several months of physical therapy and had missed substantial time from work.

---

[6] See MCR 7.212(C)(6) and (D).

Defendants have not proffered a single medical opinion to support their claim that the left rotator cuff and labral tears were the result of the April 2014 workplace incident. And given this lack of support in the record, the majority must exaggerate the contents of the record concerning that incident. The majority states that "[p]laintiff reported that while working he heard his neck and shoulder 'crack' and that the pain was so severe that he had to be driven to the hospital." This description is inaccurate and misleading. The incident report merely provides that plaintiff reported that his "neck and shoulder was [sic] sore at the end of the day"; the report does not indicate which shoulder plaintiff was referring to. Most significantly, contrary to the majority's paraphrasing, the report does *not* say that he heard his shoulder crack. The report instead states that "later that night . . . the worker felt a spasm *in his neck* whereas he felt it crack." (Emphasis added).

The majority argues that the auto accident could not have injured plaintiff's shoulder because he attempted to resume his job. His wage records show that he returned to work for two weeks following the auto accident then did not work for a week and then returned to work for three more weeks after which he determined that he could not continue. He again tried to return to work in April 2014 and was assigned to lighter work such as "directing the trucks" and "driving a bobcat," and he testified that he used his right arm for most activities during this time. When asked to explain why he attempted to return to work despite his injuries from the accident, he testified:

> I had just bought my house so I was afraid to lose my house so I was working with the pain. And I didn't want to tell anybody that I was injured because . . . in construction they find out that you're injured, they let you go.

Despite this evidence the majority concludes that the *only* possible explanation for plaintiff's brief return to work was that he was fully able to perform his job and that his inability to continue must be due to a new, unrelated injury. This is no more than speculation without support from any doctors and is inconsistent with the medical records, plaintiff's testimony and his work records. To the degree the evidence can be read to support the majority's view it merely creates a question of fact for the jury, not grounds for summary disposition.

## II. SERIOUS IMPAIRMENT

In addition to causation, defendants sought summary disposition on the grounds that plaintiff's impairments did not rise to the level of a serious impairment of a body function.

Under the no-fault act, MCL 500.3101 *et seq.*, tort liability is limited. *Patrick v Turkelson*, 322 Mich App 595, 606; 913 NW2d 369 (2018). "A person remains subject to tort liability . . . only if the injured person has suffered . . . [a] serious impairment of body function . . . ." MCL 500.3135(1). Where there is a factual dispute concerning what injuries were sustained in the accident, summary disposition based on the serious impairment threshold may not be granted unless "the dispute is not material to the determination whether the person has suffered a serious impairment." MCL 500.3135(2)(a)(*ii*). In other words, to obtain summary disposition when there is a dispute regarding the impairment, the defendant must show a lack of serious impairment *based on the injuries that the plaintiff claims.*

The no-fault act defines "serious impairment of body function" as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." MCL 500.3135(5). "On its face, the statutory language provides three prongs that are necessary to establish a 'serious impairment of body function': (1) an objectively manifested impairment (2) of an important body function that (3) affects the person's general ability to lead his or her normal life." *McCormick v Carrier*, 487 Mich 180, 195; 795 NW2d 517 (2010).

First, an objectively manifested impairment is one "that is evidenced by actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a body function." *Id*. at 196. "In other words, an 'objectively manifested' impairment is commonly understood as one observable or perceivable from actual symptoms or conditions." *Id*. The majority concludes that plaintiff fails the first prong of the serious impairment analysis because he briefly returned to work following the accident and continued to play bongo drums. However, these arguments pertain to whether the impairment affected plaintiff's ability to lead his normal life, not whether the impairment was objectively manifested. For the reasons discussed, plaintiff produced sufficient evidence to create a material question of fact as to whether he suffered an objectively manifested impairment. Namely, the medical imaging showed left shoulder full-thickness rotator cuff tear and labral tear. Thus, the claimed impairment is plainly observable by others, and the only question is whether the impairment was caused by the auto accident.

Next, an important body function is one of value, significance, or consequence to the injured person. *McCormick*, 487 Mich at 199. The majority does not seriously dispute that plaintiff's neck and shoulder function is important given his sources of income. Yet the majority concludes that plaintiff "has not demonstrated that this important body function is impaired." This again misses the mark. Although there is a question of fact as to causation, that has no bearing on whether the claimed impairment affects an important body function. Clearly, the functioning of plaintiff's neck and shoulder is important.

"Finally, if the injured person has suffered an objectively manifested impairment of body function, and that body function is important to that person, then the court must determine whether the impairment 'affects the person's general ability to lead his or her normal life.' " *Id*. at 200.

> [T]he common understanding of to "affect the person's ability to lead his or her normal life" is to have an influence on some of the person's capacity to live in his or her normal manner of living. By modifying "normal life" with "his or her," the Legislature indicated that this requires a subjective, person- and fact-specific inquiry that must be decided on a case-by-case basis. Determining the effect or influence that the impairment has had on a plaintiff's ability to lead a normal life necessarily requires a comparison of the plaintiff's life before and after the incident. [*Id*. at 202.]

"[T]he statute does not create an express temporal requirement as to how long an impairment must last in order to have an effect on 'the person's general ability to live his or her normal life.' " *Id*. at 203.

Plaintiff asserts that his general ability to lead his normal life has been affected because he can no longer perform the physical labor by which he had earned his living. That he cannot do so is not disputed. Dr. Bartol stated that plaintiff should be restricted from heavy lifting, overhead work and any activities that involve extension/rotational movements of the shoulder joint. He also opined that plaintiff is "not able to participate in normal working activities" and that even with surgery "a return to his previous occupation is unlikely." Plaintiff's inability to work in construction is relevant to whether his impairment has affected her general ability to lead a normal life. See *id*. at 218 (holding that the plaintiff's impairment affected his general ability to lead a normal life when "his capacity to work, the central part of his pre-incident 'normal life,' was affected."). Dr. Kwartowitz, on whose report the majority relies, offers no opinion as to plaintiff's ability to perform his job or any other activities.

Further, plaintiff is limited in athletic activities and in his ability to play and perform music. Plaintiff was a bongo player. It was both his primary hobby and a source of additional income. The use of his left shoulder is generally limited given his injuries.

The majority references a January 24, 2017 video of plaintiff playing bongo drums and suggests it shows that he is not limited. In fact, the video supports plaintiff's claim. Prior to his injury he was known as the "crazy bongo player," and a video of him playing bongos before the accident demonstrates considerable skill and speed. The video of plaintiff playing the bongos in 2017 is very far from "crazy"; indeed, it appears extremely sedated. In the video, plaintiff never raises his hands above his diaphragm and plays relatively slowly.

For these reasons, plaintiff has demonstrated at least a question of fact that the tears to his left rotator cuff and left shoulder labrum have affected his general ability to lead his normal life.

## III. CONCLUSION

The majority opinion is wrong on the facts and on the law. Its review of the record is incomplete and unreliable; it gives the non-movant the benefit of all inferences; and it assumes facts that do not exist and ignores facts that do. Summary disposition was improperly granted and this case should be remanded for trial.

/s/ Douglas B. Shapiro