*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

EVDUZA RAMAJ,

Plaintiff-Appellant,

v

TODD MARRA and MAUREEN MARRA,

Defendants-Appellees.

UNPUBLISHED
August 11, 2022

No. 355988
Macomb Circuit Court
LC No. 2019-004399-NZ

---

EVDUZA RAMAJ,

Plaintiff-Appellee,

v

TODD MARRA and MAUREEN MARRA,

Defendants-Appellants.

No. 356040
Macomb Circuit Court
LC No. 2019-004399-NZ

---

Before: SWARTZLE, P.J., and CAMERON and PATEL, JJ.

PER CURIAM.

This dispute involves crumbling bricks on the exterior of a house in Macomb County. Todd and Maureen Marra built the house in 2006, and by 2013, Todd noticed that some of the bricks were crumbling (or "spalling"). Defendants cut out and replaced several hundred bricks over the years. In 2018, defendants sold the house to Evduza and Kasem Ramaj "as is" and without any inspection. Before the sale, Todd discussed the brick issue with Kasem, telling him that bricks had been replaced and extra bricks were on the property if needed for future repairs. In 2019, the Ramajes noticed more brick spalling.

Evduza sued defendants, alleging that they fraudulently and negligently misrepresented the brick problem. Defendants moved for summary disposition and sought sanctions. The trial court

-1-

granted summary disposition to defendants, but denied their motion for sanctions. Both sides appealed, and for the reasons stated below, we affirm in all respects.

## I. BACKGROUND

For those parties and witnesses who share surnames, we use first names in this opinion. The evidence developed during the lawsuit and relevant to this appeal shows the following:

Todd and Maureen built the house in 2006. Arlington Masonry Supply provided over 38,000 bricks to defendants for construction of the house. The brickwork is largely if not wholly cosmetic; steel beams and columns constitute the structural frame of the house. In 2013, Todd contacted Arlington Masonry about spalling bricks. Jeff Walker from Arlington Masonry and Amos Leatherman from the brick manufacturer, Brampton Brick Limited, came to the house in September 2013.

The two spoke with Todd and surveyed the exterior of the house with respect to the brickwork. According to his deposition testimony, Todd was told by them that "water was getting underneath the brick." Todd further described the colloquy, "With our climate, it was expanding and contracting, and the brick faces were popping off; that I would need to replace the brick. I asked them if they would warranty it and they said, no, they can't warranty it. It was [a] climate issue with water freezing, expanding and contracting." When asked about this conversation during his deposition, Walker testified that he did not recall it.

Based on information collected during this visit, Brad Cobbledick, vice president of Brampton Brick, wrote a report in September 2013 diagnosing the problem and outlining recommendations. In the report, Cobbledick explained that the brick-spalling problem was caused by "improper detailing practices common in residential construction." In essence, Michigan has a cold-weather climate, and exterior brickwork that is exposed to moisture will naturally experience "freeze-thaw damage." According to Cobbledick, this risk can be prevented by "[p]roper design and detailing." To correct the problem, he "recommended that stone or pre-cast sills be installed with proper moisture controls." "[U]nless these measures [were] met," Cobbledick explained, "the brick [would] continue to spall" and "[r]eplacement of the affected brick and proper masonry design and construction practices [would] be [the] only alternative for repair."

Whether Todd received this report prior to being sued was explored during discovery. The report is addressed to Arlington Masonry with copies to Leatherman and two other Brampton Brick employees. There is nothing on the face of the report to suggest that it was sent directly to Todd, or otherwise intended to be forwarded or copied to him. During his deposition, Todd testified that he did not receive the report, and he did not speak to anyone from Arlington Masonry or Brampton Brick about any diagnosis or recommendation from the report. There is nothing in the record on appeal to suggest that Maureen received a copy of the report or had any involvement with issues involving the brickwork.

It does not appear that anyone from Brampton Brick was deposed. Evduza did, however, submit an affidavit from Cobbledick. With respect to whom the 2013 report was sent, Cobbledick stated, "My 9/26/13 report was transmitted to [Arlington Masonry], which is the direct customer of [Brampton Brick]. The expectation was that [Arlington Masonry] would in turn communicate

the information in the report to the homeowner which was [Arlington Masonry]'s customer." Thus, there is no evidence that Brampton Brick sent the 2013 report directly to Todd.

During his deposition, Arlington Masonry's Walker testified when this topic was raised, "I do not know if a report truly does exist . . . ." He went on to explain, however, that the generation of a report "is the norm." According to Walker, "When Mr. Leatherman is here, he does have to talk to his -- his bosses. The bosses will take this information and be -- and provide an explanation to the homeowner." Walker was then asked, "In those situations, *setting aside this particular Marra house but in other situations*, has it been your experience that the *manufacturer* does write a report which presumably is provided to the homeowner?" (Emphasis added.) Walker answered, "That is correct. *They* do provide a report that *they* provide to the homeowner." (Emphasis added.) Thus, at this point in his deposition, Walker asserted that it was the practice of the manufacturer to provide the report to the homeowner. When asked whether, with respect to *this house*, he had ever seen the report, forwarded the report to Todd, or otherwise talked with Todd about the contents of the report, Walker answered in each instance, "I do not recall." When pressed about whether he would have offered an explanation about what caused the brick problem, he stated, "I would have left that to the brick manufacturer."

Later during the deposition, the topic of the report was revisited. At this juncture, Walker provided a different explanation about "what *should* have happened with the report concerning that inspection." (Emphasis added.) He had noted earlier that, in fact, these types of reports never came to him and he never possessed them, though he subsequently indicated that he had "seen" reports like this one. He then offered that, in the "normal course," a report like this would have been received and processed by Arlington Masonry's accounting department. The report would then have gone to a manager, and that manager would contact the homeowner "and relay the message that they have the inspection report." He answered in the affirmative when asked immediately thereafter whether the manager would "communicate with [the] homeowner about" the report. But when asked whether he had occasion to "ever deal" with Todd after the September 2013 visit, Walker replied again, "I do not recall." He suggested that there might have been another manager assigned to Todd's case, though Walker admitted that he was the Arlington Masonry representative who went to Todd's house that September.

Returning to the timeline, shortly after the site visit by Walker and Leatherman in 2013, Todd spoke with Salvador Giovia, a brick mason who was doing some work next door. Although Todd's focus was on bricks that were spalling in the back of the house, Giovia noticed additional spalling bricks in the front. Giovia testified that, in his opinion, the problem was due in part to the relatively low quality of the brick. Although more drastic means could be taken to deal with the problem (e.g., changing the whole structure), Giovia testified that one solution would be to "[c]ut out and replace the brick." He did, in fact, do this in 2013, cutting out and replacing approximately 150-160 bricks for a total charge of $2,500.00. Todd had Giovia come back in 2016, and the brick mason cut out and replaced over 200 different spalling bricks and sprayed water repellant on bricks in the front. The total cost of the repairs was $3,150.00. After the second job, unused bricks were left in a pile on the side of the house in case spalling bricks needed to be replaced in the future.

Defendants put the house on the market in 2018. Evduza, a relator and mortgage broker, and Kasem, a property manager, were interested in purchasing the house. During their last viewing, Kasem noticed that some of the bricks in the back were shaded differently than others,

and he asked Todd about it. The conversation took place in the area of the walkout basement, though there is some disagreement about whether they were just inside or outside the walkout doors. Defendants' real estate agent and Evduza were in the same area. Kasem testified that the discussion lasted for "20 to 30 minutes," though it is unclear whether the entire discussion was about bricks.

In any event, when asked during his deposition whether Todd told him that bricks needed to be periodically replaced "due to the climate and the freezing and thawing and the water getting into the brick facing and popping them off," Kasem responded, "He explained something similar to that, yes." Kasem further explained that Todd told him about a pile of bricks near the side of the house in case more bricks needed to be replaced in the future. While Todd recalled that the two spoke only briefly about the bricks, the record makes clear that there is no material dispute about the substance of the discussion. When asked during his deposition whether he was satisfied at the time with this explanation, Kasem answered, "Absolutely I was satisfied."

Evduza made a cash offer on the house. As part of the negotiations, Todd sought a sale with "[n]o contingencies such as inspection, appraisal or anything else I am missing." Furthermore, defendants wanted to sell the house "as is." As required by law, defendants executed a seller's disclosure statement, which stated, in relevant part, that the house did not have any "[s]ettling, flooding, drainage, structural or grading problems." The parties entered into a purchase agreement, and the sale was closed in November 2018. (Although Kasem is not a party to this lawsuit, he confirmed during his deposition that he is a co-owner of the house.)

In early 2019, Evduza noticed more spalling bricks. After talking with Todd and receiving estimates on remediating the problem, Evduza sued defendants. Evduza asserted that the problems with spalling bricks were more extensive than what Todd explained to Kasem. She maintained that defendants misrepresented the problems when negotiating the sale of the house. She made four claims against defendants: (1) breach of contract; (2) fraudulent misrepresentation; (3) silent fraud; and (4) negligent misrepresentation. (The trial court dismissed the breach of contract claim, and Evduza has not challenged that dismissal on appeal.)

Defendants answered and discovery ensued. Defendants subsequently moved for summary disposition of the three remaining misrepresentation claims under MCR 2.116(C)(10). They argued that Todd was never given the 2013 Brampton Brick report, and that they did not conceal any known issues leading up to sale. Defendants also sought sanctions, arguing that the lawsuit was frivolous. Evduza opposed both summary disposition and sanctions.

The trial court granted summary disposition to defendants, but denied their motion for sanctions. The trial court concluded that Evduza's misrepresentation claims failed because nothing in the record established that defendants received the 2013 report or that they were aware the brick issue was extensive or might cause a structural issue with the house. With respect to sanctions, the trial court concluded that discovery might well have shown that defendants had more extensive knowledge than, in fact, they did, and therefore it was not frivolous to pursue the lawsuit.

These appeals followed. In Docket No. 355988, Evduza appeals as of right the trial court's grant of summary disposition on her three misrepresentation claims. In Docket No. 356040, Todd and Maureen appeal as of right the trial court's denial of their request for sanctions.

## II. ANALYSIS

### A. SUMMARY DISPOSITION

Evduza argues that the trial court erred by granting summary disposition in favor of defendants. "We review de novo a trial court's decision to grant or deny a motion for summary disposition." *Sherman v City of St Joseph*, 332 Mich App 626, 632; 957 NW2d 838 (2020) (citations omitted). We review a motion under MCR 2.116(C)(10) "by considering the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018). "Summary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Sherman*, 332 Mich App at 632.

### B. *CAVEAT EMPTOR* AND ITS EXCEPTIONS

Evduza relies on Michigan's Seller Disclosure Act in support of all three of her common-law misrepresentation claims. The act requires a seller of real property to disclose personally known conditions and respond to inquiries by a prospective buyer. MCL 565.955-565.956, 565.964. The act itself does not create a private right of action for damages, but a breach of the act may support a common-law tort claim. See MCL 565.954, 565.961; *Randall v Mich High Sch Athletic Ass'n*, 334 Mich App 697, 717-720; 965 NW2d 690 (2020).

"The common-law rule with respect to real estate transactions is *caveat emptor*," the principle that a purchaser buys property at her own risk, colloquially referred to as "buyer beware." *Roberts v Saffell*, 280 Mich App 397, 402; 760 NW2d 715 (2008), aff'd 483 Mich 1089 (2009). "[A]t common law 'a land vendor who surrenders title, possession, and control of property shifts all responsibility for the land's condition to the purchaser.' " *Id*., quoting *Christy v Prestige Builders, Inc*, 415 Mich 684, 694; 329 NW2d 748 (1982). Yet, there are several exceptions to the general rule of *caveat emptor* in real-estate transactions, including: (1) fraudulent misrepresentation; (2) silent fraud; and (3) negligent misrepresentation. *Alfieri v Bertorelli*, 295 Mich App 189, 193-194; 813 NW2d 772 (2012); *Roberts*, 280 Mich App at 403; *Bergen v Baker*, 264 Mich App 376, 385; 691 NW2d 770 (2004). See also *Matyas v Minck*, 37 Conn App 321, 338; 655 A2d 1155 (1995); Fraud and Negligent Misrepresentation, Environmental Liability Allocation Law & Practice § 9:41 (2021).

Both fraudulent misrepresentation and silent fraud involve one party knowingly or recklessly deceiving another. In the former theory, the deception is made with an affirmative false representation about a material fact; in the latter, the deception is made by suppressing a material fact that the party was legally obligated to disclose. See *Alfieri*, 295 Mich App at 193-194; *Roberts*, 280 Mich App at 403. To succeed under either theory, the plaintiff must show that, among other things, when the false representation was made or the true representation suppressed, the defendant either (1) had sufficient knowledge about the truth of the matter, or (2) made the false representation or suppressed the true one recklessly, without knowledge of the truth of the matter. See *Alfieri*, 295 Mich App at 193-194; *Roberts*, 280 Mich App at 403. As for negligent misrepresentation, a plaintiff must show, among other things, that she "justifiably relied" to her "detriment on information prepared without reasonable care" by the defendant. *Alfieri*, 295 Mich App at 194 (quotation marks and citation omitted). Similarly, the Seller Disclosure Act requires

in relevant part, "The information provided to a prospective purchaser pursuant to this act shall be based upon the best information available and known to the transferor." MCL 565.956. Although there are additional elements that a plaintiff must show to succeed on any of the common-law theories, this appeal comes down to what defendants knew or reasonably should have known when they sold their house to Evduza.

## C. THE 2013 BRAMPTON BRICK REPORT

Evduza's claims rely on the same basic argument: defendants knew or reasonably should have known the extent of the brick-spalling issue because they received the 2013 Brampton Brick report; the report explained that the problem was extensive and structural; and defendants intentionally kept that information from Evduza as she and Kasem considered buying the house. There is nothing in the record to establish that Maureen had any direct knowledge of the brick-spalling issue because Todd was the one who always addressed the issue.

As for Todd, he testified that he was told during the September 2013 site visit with Walker and Leatherman that water was getting beneath the brick, and with Michigan's regular freeze/thaw cycle, the bricks were contracting and expanding, thereby causing the spalling. He testified that he was told during that visit that he would need to replace the damaged bricks, and later when he spoke with Giovia, he was given the same advice. This was, in fact, what Giovia did in 2013 and again in 2016. When asked about what he told Todd during this visit or anytime thereafter, Walker could not recall.

With respect to the 2013 Brampton Brick report, Evduza's counsel repeatedly inquired during discovery whether the report was sent to Todd. For his part, Todd testified that he never received the report, and there is no deposition testimony, affidavit, or other evidence from a Brampton Brick representative to the contrary. The report itself was addressed to Arlington Masonry, not Todd, and only Brampton Brick employees were copied on it. Walker testified repeatedly that he did not ever contact, or he did not recall ever contacting, Todd about the report; in fact, he did not recall even seeing the report itself. Walker testified at one point that he believed that it would have been the manufacturer's responsibility to provide the report to the homeowner; though, again, the report itself and Cobbledick's affidavit confirm that the manufacturer did not send the report to Todd.

## D. "ROUTINE PRACTICE" UNDER MRE 406

The dissent offers a different line of attack for Evduza—evidence of a "routine practice" under MRE 406. Under that rule,

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice [MRE 406].

Before reaching the substance of the analysis, we observe that no party has mentioned MRE 406 or the related caselaw to-date—not before the trial court, not in the claim of appeal, not in the briefs on appeal, and not during oral argument. It is not the routine practice of this Court to

raise theories *sua sponte* in support of a sophisticated party in a run-of-the-mill civil lawsuit that the party either declined to raise or simply missed. This theory has not gone through the crucible of "an adversarial contest among competing interests." *In re Smith*, 335 Mich App 514, 521; 967 NW2d 857 (2021); see also *League of Women Voters of Mich v Sec'y of State*, 506 Mich 561, 521-522; 957 NW2d 731 (2020) (explaining that "[t]he judiciary cannot simply scan the horizon for important legal issues to opine on"). Rather, the theory has been dependent on the inquisitional efforts of a panel of appellate judges.

Nor is the dissent's MRE 406 analysis merely a "theory of admissibility of evidence." The question is not, for instance, whether a particular record contains hearsay or whether an expert's testimony is supported by admissible facts or data. See MRE 703; MRE 802. Instead, MRE 406 sets forth a legal rule of relevance, whereby a party can establish that a person or entity acted in a specific way in a particular instance based on evidence of a then-existing habit or routine. Courts have analyzed and interpreted this rule and set forth specific standards under which it applies. This is a new, substantive legal theory not thoroughly developed by a party; under principles of waiver, this theory is not properly before us. *In re Conservatorship of Murray*, 336 Mich App 234, 240-242; 970 NW2d 372 (2021).

As to the merits: Generally speaking, a witness testifying about a routine practice must have actual knowledge of the practice and be able to testify that a specific practice has happened on countless occasions. *Laszko v Cooper Laboratories, Inc*, 114 Mich App 253, 255-256; 318 NW2d 639 (1982); see also 29 Am Jur 2d, Evidence—Routine practice of organization, § 386, p 468 (explaining the need for evidence "that ensures more than a mere tendency to act in a given manner, but, rather, conduct that is semi-automatic in nature," or, in other words, "a regular response to a repeated specific situation").

Measured against this bar, Walker's testimony was inconsistent, vague, with a shaky foundation—in a word, deficient. He suggested at one point, for example, that it would have been Brampton Brick's role to provide the report to Todd, but this suggestion was contrary to direct, unrebutted evidence that the manufacturer did not provide the report to the customer. Walker repeatedly disclaimed any knowledge of what happened with the report, and he admitted that he never possessed any reports like it, so the basis of his testimony at the end of the deposition about what happened in the "normal course" with these types of reports is unclear, at best. Moreover, his testimony came up short as to what an Arlington Masonry manager would actually communicate to the homeowner, describing it as "relay[ing] the message that they [Arlington Masonry] have the inspection report." But merely telling a homeowner about the possession of a report does not communicate the contents and conclusions of the report. Walker offered no explanation of what would happen, if anything, if the homeowner did not get or return the message; no suggestion that the report would be mailed, emailed, or otherwise delivered to the homeowner; no record of any contact or follow-up. Contrary to the dissent's repeated assertion, Walker does not actually testify that a manager would routinely pass along the report to, and discuss its contents with, the homeowner.

Nor is there anything in the record to give clarity about what, specifically, was the "normal practice." There are no accounting records, phone records, emails, or even a handwritten jot in a customer file, either about the 2013 Brampton Brick report or any other report. In fact, several of the questions to Walker were framed in such a way so as to *exclude* this particular instance from

the "normal practice." When asked whether he ever dealt with Todd after the September 2013 site visit or whether he even knew that a report had been generated by Brampton Brick for this house, Walker could not recall.

In the final analysis, Walker's testimony is deficient on the key question of whether Todd actually received the report. To read into Walker's testimony evidence of a "routine practice" sufficient to raise a question of fact, one would have to replace the metaphorical chain of inference with a penumbra of inference. On this record, as developed and argued by these parties, there is no genuine issue of material fact on whether Todd received a copy of the 2013 Brampton Brick report—he did not.

### E. THE EVIDENCE CONFIRMS THAT TODD DISCLOSED WHAT HE KNEW

Thus, the record confirms that, prior to the sale, Todd told Kasem that the brick spalling was due to Michigan's climate and the freeze/thaw cycle. Todd explained that, as bricks spalled, he had them cut out and replaced, and he informed Kasem that there was a pile of bricks on the side of the house for future brick replacement. This explanation was consistent with what Todd said he was told by the Arlington Masonry and Brampton Brick representatives in September 2013 as well as by Giovia. Based on this explanation, Kasem was put on notice that there was an on-going problem with spalling bricks, that the problem would likely continue into the future, and that a solution would be to cut out and replace the spalling bricks on an on-going basis.

Given what the record shows about what Todd was told, and given that there is nothing in the record to suggest that Todd has specialized or expert knowledge about brick masonry, there is no evidence to show that Todd knew, acted with reckless disregard, or acted without reasonable care about a more extensive problem with the house's brick work prior to the 2018 sale. In short, the record shows that Todd believed that the spalling bricks were caused by Michigan's freeze/thaw cycle; the problem was not structural; and a solution would be to replace individual bricks as they became damaged. This is what Todd disclosed prior to the sale.

Thus, viewing the evidence in the light most favorable to Evduza, there is no genuine issue of fact as to whether Todd or Maureen knowingly deceived Evduza or her husband or otherwise acted with reckless disregard or without reasonable care when informing them of the brick problem. Evduza and her husband agreed to buy the house "as is," without an inspection, and they were not fraudulently or negligently misinformed by defendants about the bricks. Given this, Evduza cannot succeed on any of her claims for relief, and we affirm summary disposition in favor of defendants.

### F. SANCTIONS

In Docket No. 356040, defendants argue that the trial court erred by denying their request for sanctions under MCL 600.2591 on the ground that Evduza's claims were frivolous. A claim is frivolous if one of the following conditions is met:

> (*i*) The party's primary purpose in initiating the action or asserting the defense was to harass, embarrass, or injure the prevailing party.

(*ii*) The party had no reasonable basis to believe that the facts underlying that party's legal position were in fact true.

(*iii*) The party's legal position was devoid of arguable legal merit.   [MCL 600.2591(3)(a).]

There is nothing in the record to suggest condition (*i*) or (*iii*) was met.  As for (*ii*), discovery might have shown that Todd received the 2013 Brampton Brick report or had acquired additional information about the brick-spalling problem that he did not share with Evduza or Kasem.  The fact that discovery did not reveal more favorable evidence for Evduza's claims does not mean that the claims were frivolous.  Thus, we affirm the trial court's denial of sanctions.

## III.  CONCLUSION

For the reasons stated in this opinion, we affirm the trial court's order granting summary disposition to defendants in Docket No. 355988 as well as its order denying defendants' motion for sanctions in Docket No. 356040.  Neither side is entitled to costs on appeal.  MCR 7.219.

/s/ Brock A. Swartzle
/s/ Thomas C. Cameron