*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LEANDRE GHOLSTON and THERESA
GHOLSTON,

FOR PUBLICATION
June 10, 2025
9:38 AM

Plaintiffs-Appellants,

v

No. 367226
Wayne Circuit Court
LC No. 22-007977-CH

SCOTT SHERRILL and DANNY SHERRILL,

Defendants-Appellees.

Before: M. J. KELLY, P.J., and SWARTZLE and ACKERMAN, JJ.

SWARTZLE, J.

Is known contaminated groundwater itself an "environmental hazard" to be disclosed under Michigan's seller disclosure act? As explained, the answer is *yes*, even when, as here, there is no known associated contamination of the soil or vapor intrusion in the home. In concluding otherwise, the trial court erred in granting summary disposition to defendants, and we reverse.

## I. BACKGROUND

### A. TCE CONTAMINATION

Defendants sold their home to plaintiffs. The property is located near a former site of a General Motors Corporation (GM) manufacturing plant. During the plant's operation, GM released solvents into the soil and groundwater, and years later, trichloroethylene (TCE) was found in the surrounding groundwater.

TCE is a carcinogen, and human exposure typically occurs by drinking contaminated water or breathing contaminated air. TCE in groundwater can migrate to the adjacent soil and, by a mechanism called "vapor intrusion," the substance can enter homes through openings in the floor and walls. The City of Livonia supplies water to the subject home, so it is unlikely that any human exposure to TCE would occur there as a result of consuming contaminated groundwater. Rather, the primary vector would be through migration into the soil and home.

In 2011, GM transferred the industrial property to the Revitalizing Auto Communities Environmental Response (RACER) Trust to "remediate contamination and prepare the property

-1-

for beneficial reuse." That same year, the federal Environmental Protection Agency (EPA) requested that RACER test the soil and homes in the surrounding area for contamination. RACER did not detect TCE vapor in any homes, but it did detect high levels of TCE in the soil under one home. RACER installed a vapor-mitigation system in that home. The following year, the Michigan Department of Community Health cautioned that "continued monitoring of groundwater and soil vapor" in the area was necessary for public health.

In 2016, RACER detected high levels of TCE in groundwater samples under the street of the home at issue here. Soil-vapor test results remained below EPA recommended levels, but EPA guidance suggested "ongoing sampling even when the soil vapor concentrations are low if TCE is present in groundwater above the [vapor-intrusion] screening level." This guidance was consistent with RACER practice: "Because subsurface conditions can change seasonally and yearly, ongoing sampling is conducted to ensure that [vapor-intrusion] conditions will not pose a potential unsafe exposure to TCE in the indoor air of homes."

RACER conducted more sampling the following year and installed additional monitoring wells. The sampling found TCE above EPA recommended levels in the soil of one property (not the property at issue here), and RACER accordingly installed a mitigation system on that property. Monitoring in the area continued in subsequent years, with groundwater samples continuing to be above EPA recommended levels, but soil-vapor samples below the agency's recommended levels. RACER has funding through 2036 to continue monitoring and, when necessary, installing and maintaining mitigation systems.

## B. SALE OF THE SUBJECT HOME

Defendants had owned and lived in the home since 2003. As a result of the contaminated groundwater, RACER installed TCE monitoring wells in the rear of the subject property. Grant Trigger, a cleanup manager with RACER, sent defendants a letter in October 2013, stating in relevant part, "TCE, and other chemical vapors related to TCE, were not detected in your home from the groundwater plume even though TCE and some TCE-related chemical vapors were detected in the ground near your home. Therefore vapor intrusion of TCE and related chemicals is not occurring at your home under current conditions." Defendants dispute that they received this letter.

In preparing to sell their home, defendants completed a Seller's Disclosure Statement (SDS) in June 2021, as required by the seller disclosure act, MCL 565.951 et *seq*. As part of the SDS, defendants checked "no" in response to the following query:

> 10. Environmental problems: Are you aware of any substances, materials or products that may be an environmental hazard such as, but not limited to, asbestos, radon gas, formaldehyde, lead-based paint, fuel or chemical storage tanks and contaminated soil on the property.

The SDS included a recommendation that a prospective buyer "obtain professional advice and inspections of the property to more fully determine the condition of the property," and the "inspections should take indoor air and water quality into account."

Four days after signing the SDS, defendant Scott Sherrill sent a text message to Jeff Crum, a toxicologist and vapor-intrusion specialist who consulted with RACER, writing, "so I don't me

[sic] to rush ya but that info would be great as soon as possible.  so we have answers for potential buyers.  we have showings all day today and the rest if [sic] weekend."  Crum responded that Trigger would like to work directly with defendants on the sale of defendants' home.  Crum told Scott, "We have successfully teamed with homeowners to accomplish sales at 4 other homes on" the street, and Trigger wanted to "customize the fact sheet for the contamination and wells specific to [defendants'] property."

Five days later, Trigger sent an email to Scott, providing a "draft form letter" to give to potential buyers.  Trigger explained that RACER was preparing a fact sheet with history of the subject property, and he would send a draft to defendants later that day.  Trigger also offered to speak personally with any potential buyer.  It does not appear, at least on the current record, that defendants forwarded any of this information to prospective buyers, including plaintiffs.

On the same day as Trigger's email, plaintiffs and defendants entered into a purchase agreement for the home.  In the agreement, plaintiffs acknowledged that they were not having the property inspected, and they agreed that they were accepting the property "as is."  Plaintiffs had visited the property twice before the sale.

While plaintiffs were moving into the home in August 2021, Crum visited the property.  This was, according to plaintiffs, the first time that they were notified about the TCE contamination.  Crum then pointed out to plaintiffs the monitoring wells located on the property.  The next day, Crum sent them a fact sheet about the TCE contamination.  He explained that he and Trigger would like to meet with plaintiffs to talk about how best to continue monitoring the property.

Plaintiffs contacted defendants, which prompted Scott to email Trigger, asserting in relevant part, "I know the property is not contaminated, that it is the underground water far under and that the soil is not to my knowledge contaminated."  Scott went on to explain that he had gardened on the property and never been told that the property was contaminated.  It was Scott's understanding that RACER was monitoring because of the potential that vapor could enter the home, but no vapor had been detected.  Scott later asked Trigger where he could locate public records about the TCE monitoring, as he had searched but could not find anything.

## C.  LAWSUIT

Plaintiffs sued defendants in July 2022, alleging violation of the seller disclosure act, fraudulent misrepresentation, and silent fraud; as remedy, they sought rescission of the purchase agreement.  Defendants moved for summary disposition under MCR 2.116(C)(8) and (10), arguing that there was no evidence that the property was contaminated, and, even if it were, plaintiffs' reliance on the SDS was unreasonable.  Defendants acknowledged that TCE was present in the groundwater, but they maintained that the groundwater contamination was not actionable because the home used municipal water.  As a result, plaintiffs were not damaged by the groundwater contamination, according to defendants.  Defendants also challenged the testimony of plaintiffs' proposed appraisal experts.

The trial court granted defendants' motion under MCR 2.116(C)(10), determining that plaintiffs failed to present sufficient evidence that the property was contaminated and that plaintiffs' reliance on the SDS was not reasonable.  Because no transcript was available from the

hearing on the motion, the trial court issued an order summarizing its "findings of fact and conclusions of law."[1]  The trial court noted that defendants checked "no" to the question about environmental problems on the SDS; there was TCE in the groundwater, approximately 10-12 feet under the property's surface; plaintiffs did not have the property inspected or "perform online research regarding contamination," while "the presence of TCE in the groundwater was publicly known"; and plaintiffs did not "present any evidence of third-party contamination at the subject property that was either perpetrated, concealed, or known by Defendants to be an environmental hazard."  The trial court did not address defendants' argument about damages.

Plaintiffs now appeal.

## II. ANALYSIS

### A. STANDARD OF REVIEW

On appeal, plaintiffs argue that the trial court erred by granting summary disposition in defendants' favor. This Court reviews de novo a trial court's decision on a motion for summary disposition. *Sherman v St Joseph*, 332 Mich App 626, 632; 957 NW2d 838 (2020).  A trial court properly grants summary disposition under MCR 2.116(C)(10) when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Id*.  "When deciding a motion for summary disposition under MCR 2.116(C)(10), we consider the evidence submitted in a light most favorable to the nonmoving party." *Payne v Payne*, 338 Mich App 265, 274; 979 NW2d 706 (2021).  Statutory interpretation is a question of law which this Court reviews de novo. *Sherman*, 332 Mich App at 632.

### B. A SELLER'S DISCLOSURE UNDER THE LAW

When transferring residential real estate, the seller must disclose certain information to a prospective buyer under the seller disclosure act.  Generally speaking, information to be disclosed covers "the condition and information concerning the property, known by the seller."  MCL 565.957.  The disclosure must be made in "good faith," defined by the act as "honesty in fact in the conduct of the transaction."  MCL 565.960.  The act mandates disclosure of information known to the seller, and it absolves the seller of any liability for, among other things, "any error, inaccuracy, or omission . . . not within the personal knowledge" of the seller.  MCL 565.955(1).  A seller can subsequently amend the disclosure, subject to certain requirements.  MCL 565.962.  A purchase agreement can be terminated, at the buyer's option, when information is not disclosed prior to the sale.  MCL 565.954(3).

For its part, the act does not mandate extensive investigation.  Specifically, the act does not create a duty on the seller to discover information about the property "that could be obtained only through inspection or observation of inaccessible portions of real estate or could be discovered only by a person with expertise in science or trade beyond the knowledge of the" seller.  MCL

---

[1] When ruling on a motion under MCR 2.116(C)(10), a trial court is not supposed to make "findings of fact."  Rather, the question is a strictly legal one—i.e., is there a genuine issue of material fact—albeit one determined by a court reviewing the factual record.  See *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018).

565.955(1).  As the standard disclosure form makes clear, the information disclosed does not create a warranty by the seller.  MCL 565.957(1).

But as the act also makes clear, the statutory disclosure requirements do "not limit or abridge any obligation for disclosure created by any other provision of law regarding fraud, misrepresentation, or deceit in transfer transactions."  MCL 565.961.  In line with this, plaintiffs sought rescission of the transaction under theories of fraudulent misrepresentation and silent fraud against defendants, both of which involve a seller's knowing misrepresentation about a material fact.  See *Roberts v Saffell*, 280 Mich App 397, 405; 760 NW2d 715 (2008); *Bergen v Baker*, 264 Mich App 376, 382; 691 NW2d 770 (2004).  Central to all of plaintiffs' claims is the assertion that groundwater underneath the home that is contaminated with TCE is, by itself, an "environmental hazard" that should have been disclosed.

### C.  CONTAMINATED GROUNDWATER AND "ENVIRONMENTAL HAZARD"

As an initial matter, we assume on this record that neither the soil nor the home showed any signs of TCE contamination when defendants sold the home to plaintiffs.  We also take as established on the current record that plaintiffs were not directly exposed to TCE through consumption or other use of the contaminated groundwater, as the home is connected to a municipal-water system.  Thus, the central question boils down to the following: Is groundwater contaminated with TCE itself an "environmental hazard" under the seller disclosure act, even though (1) the contamination had not migrated to the adjacent soil or residential building, and (2) the building did not draw water from the groundwater?  As the parties acknowledge, and our own research confirms, there is no binding precedent directly on point.  Thus, we must determine what our Legislature meant with the phrase "environmental hazard."

To begin, we dispense with the objection that the surface soil or residential building itself must necessarily be contaminated to trigger disclosure, as opposed to "merely" contamination of the groundwater under the home.  The act itself makes this clear by providing two distinct types of "potentiality" as opposed to "actuality"—one explicit, the other implicit.  Explicitly, the SDS form requires disclosure "of any substances, materials, or products that *may be* an environmental hazard."  MCL 565.957(1) (emphasis added).  Used in this context, the phrase "may be" has a certain level of open-endedness or potentiality to it.  Instead of "may be," our Legislature could have limited disclosure to "substances, materials, or products that *are* an environmental hazard," but it did not do so, and we must give substance to our Legislature's choice of words.  *D'Agostini Land Co, LLC v Dep't of Treasury*, 322 Mich App 545, 554; 912 NW2d 593 (2018).

Implicitly, a hazard can be understood to be an existing, immediate danger *or* a risk of potential future danger.  See VII *Oxford English Dictionary* (2d ed, 1989), p 31 (defining "hazard" in relevant part as "[r]isk of loss or harm; peril, jeopardy" and "at stake, in danger").  Once again, our Legislature could have narrowed the scope of the act by requiring disclosure of only "existing, immediate environmental dangers" or the like, as opposed to risks of potential future danger, but it did not do so.  So long as there remains an actual, viable vector through which the contaminant in the groundwater can migrate to the soil and air, there is a risk to the environment.

There is only so much, however, that can be gleaned further from the seller disclosure act about the meaning of "environmental hazard."  Our Legislature did not define the phrase in that act.  It did provide by way of example a list of what must be disclosed as an "environmental

hazard": "asbestos, radon gas, formaldehyde, lead-based paint, fuel or chemical storage tanks and contaminated soil on the property." MCL 565.957(1). Most of these are man-made, though radon gas is a naturally occurring radioactive gas. And most of these are substances that, when a person is exposed to a particular substance at a sufficient level, pose a serious threat to that person's health, safety, or welfare, though a fuel or chemical storage tank would presumably be dangerous only if it leaked. From this list, it seems clear that our Legislature was focused on substantial risks to a person's health, safety, or welfare that could arise when that person is sufficiently exposed to certain chemical or radioactive materials in the air, water, soil, or building material associated with the residential property.

Further consultation of a lay dictionary would not be fruitful. The determination of what constitutes a hazardous chemical or radioactive material is a medical and scientific matter, and use of a lay dictionary would not be appropriate in this circumstance. See *Thirty-Sixth Dist Court v Owen*, 345 Mich App 637, 645; 8 NW3d 626 (2023). Rather, we turn next to statutes enacted by our Legislature regulating the same or similar substances. See *Potter v McLeary*, 484 Mich 397, 411; 774 NW2d 1 (2009).

The Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq.*, provides particularly helpful guidance. The purpose of the NREPA is to protect and conserve the natural resources of this state, see *Rott v Rott*, 508 Mich 274, 292; 972 NW2d 789 (2021), and clean groundwater, soil, and air all constitute natural resources as contemplated by the act. As part of its responsibilities here, RACER has been involved in monitoring and remediating TCE contamination in the area. The NREPA has a remediation component, and in that part of the act, our Legislature defines "environment" as "land, surface water, *groundwater*, subsurface strata, air, fish, wildlife, or biota." MCL 324.20101(o) (emphasis added).

Our Legislature defines "environmental contamination" as "the release of a hazardous substance, or the potential release of a discarded hazardous substance, in a quantity which is or may become injurious to the environment or to the public health, safety, or welfare." MCL 324.20101(p). A "hazardous substance" includes substances "that the department demonstrates, on a case by case basis, poses an unacceptable risk to the public health, safety or welfare, or the environment," or substances identified in the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 USC 9601. MCL 324.20101(x)(*i*) and (*ii*). Also helpful to our analysis, in the context of underground storage tanks, MCL 324.21302(g) defines "contamination" as "the presence of a regulated substance in soil, surface water, or groundwater or air that has been released from an underground storage tank system at" certain levels. Groundwater is defined as "water below the land surface in the zone of saturation and capillary fringe." MCL 324.21302(k).

From these other statutes, read within the context of the seller disclosure act, we gain some guidance on what our Legislature meant with the phrase "environmental hazard" in the act. First, the "hazard" covers both actual releases and potential migrations in quantities that are or may become injurious to environment or a person's health, safety, or welfare. Second, the phrase "environmental hazard" must be understood within the context relevant to a new buyer of a residence, and not necessarily so broad as to encompass all risks affecting other property, whether privately held or held in public trust. In other words, the relevant "environment" in the seller disclosure act is that of the particular residential property and the affected air, ground, water, and

building materials associated with that property, not necessarily the broader environment of the community or state. And third, the substance must pose an "unacceptable risk," as our Legislature has made clear that the disclosure requirement should not be transformed into a seller's warranty against any and all risks of purchase.

Taken together, we conclude that a reasonable reading[2] of "environmental hazard" under the seller disclosure act means the following: An "environmental hazard" is an unacceptable risk to a person's health, safety, or welfare posed by the presence of a substance, material, or product in the soil, surface water, groundwater, air, or building materials associated with the subject property.

Applying this definition to the record here, we conclude that the trial court erred in granting summary disposition to defendants. There is no question that TCE is a carcinogen that, with exposure above a sufficient level, endangers a person's health, safety, or welfare. See, e.g., *Alfieri v Bertorelli*, 295 Mich App 189, 191-192; 813 NW2d 772 (2012); *ITT Indus, Inc v Borgwarner, Inc*, 700 F Supp 2d 848, 857 (D Mich, 2010); Mich Admin Code R. 299.4453(2)(bb). See also *Santa Clarita Valley Water Agency v Whittaker Corp*, 99 F4th 458, 476-477 (CA 9, 2024) (identifying TCE as a hazardous substance under CERCLA). There is also no question that TCE was present in levels above those set by the EPA in the groundwater below the subject property. Finally, there is at least a question of fact that, at the time of transfer, there was an actual, viable contaminate vector from the groundwater to the property's soil and air. TCE is known to migrate from groundwater to soil and buildings via vapor intrusion, and this does not appear to have been a hypothetical or de minimis concern here but an actual, unacceptable risk, as strongly suggested by (1) mitigation efforts undertaken at neighboring properties, and (2) monitoring equipment installed at the subject property and surrounding properties. Thus, the trial court erred in granting summary disposition in favor of defendants on the basis that there was no "environmental hazard" to disclose under the seller disclosure act.

## D. REASONABLE RELIANCE

As an independent basis for summary disposition, defendants also argued, and the trial court agreed, that there was no genuine issue of material fact that plaintiffs' reliance on the SDS was unreasonable. "There can be no fraud where a person has the means to determine that a representation is not true." *Nieves v Bell Indus, Inc*, 204 Mich App 459, 464; 517 NW2d 235 (1994). A plaintiff alleging fraudulent misrepresentation must demonstrate that reliance on the defendant's representations was reasonable. *Foreman v Foreman*, 266 Mich App 132, 141-142; 701 NW2d 167 (2005). A purchaser does not, however, have an independent duty to investigate a seller's affirmative representation. *Titan Ins Co v Hyten*, 491 Mich 547, 555 n 4; 817 NW2d 562 (2012).

On this record, there remains a genuine issue of material fact whether plaintiffs reasonably relied on the SDS disclosure. There is nothing in the record to suggest that plaintiffs were actually aware of any information about the TCE contamination. As for whether they reasonably should have known, defendants did affirmatively represent that there were no known environmental hazards associated with the property; so, defendants certainly did not put plaintiffs on notice to

---

[2] Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (Thomson/West, 2012), p 33.

investigate further. As for what was publicly available, there is evidence that even defendants had trouble identifying the relevant information and had to ask RACER where to locate the information.

Defendants point to the "as is" clause and argue that, if plaintiffs were concerned about potential environmental hazards, they should have had an inspection done prior to the purchase. Fair point for hazards about which defendants had no knowledge, as an "as is" clause "allocate[s] the risk of loss arising from conditions *unknown to the parties*." *Lorenzo v Noel*, 206 Mich App 682, 687; 522 NW2d 724 (1994) (emphasis added). For similar reasons, an "as is" clause "transfer[s] the risk of loss where the defect should have reasonably been discovered upon inspection, but was not." *Id*. What an "as is" clause does not do, however, is protect a seller from refusing to disclose a known hazard. See *id.*

Although it is possible, as defendants argue on appeal, that an inspector would have found the monitoring sites, the current record does not conclusively show that an inspection would have given plaintiffs the same information that defendants appear to have had about the hazard. On this record, there remains a genuine issue of material fact on whether it was reasonable for plaintiffs to rely on defendants' representation that there was no environmental hazard associated with the subject property.

### E. "PERSONAL KNOWLEDGE" UNDER THE SELLER DISCLOSURE ACT

Finally, as explained earlier, the seller disclosure act requires disclosure of known environmental hazards, not unknown hazards or hazards that would require a certain level of expertise to discover. But similar to the other issues on appeal, there is a genuine issue of material fact on this record about what defendants actually knew concerning the TCE contamination. There is evidence that defendants were aware of the groundwater plume in 2013 and were similarly aware that the contaminant had spread beyond groundwater and affected neighboring properties. The fact that RACER had installed monitoring equipment on defendants' property before the sale supports a finding that defendants knew about the hazard. The record shows that Scott even went so far as to reach out to RACER prior to the sale, and the record suggests that he received or otherwise knew about information compiled by RACER that could have been helpful for a potential buyer to assess the hazard.

The act does not assume omniscience on behalf of a seller. A seller may comply with the act by indicating that an item of information is unknown. See MCL 565.956. Further, the act anticipates that a seller might receive relevant and material information about a hazard after completing the SDS, MCL 565.962, and defendants could have amended the disclosure, but they did not do so. Thus, based on our review of the current record, there remains a question of fact on what defendants knew about the hazard prior to sale.

### F. ALTERNATIVE GROUNDS FOR SUMMARY DISPOSITION

Defendants argue on appeal that there are alternative grounds for this Court to affirm summary disposition in their favor. They argue that plaintiffs have not suffered any damages and plaintiffs' experts were not credible. Although defendants raised these arguments below, the trial court did not address them, and this Court will not do so in the first instance. *Camden v Kaufman*, 240 Mich App 389, 399; 613 NW2d 335 (2000).

## III. CONCLUSION

Contamination of groundwater below a home, when there is an actual, viable vector for the contaminate to migrate to the soil or air of the property, is an "environmental hazard" under the seller disclosure act and must be disclosed on the SDS prior to sale. Because there remain genuine issues of material fact on the grounds relied on by the trial court when it granted summary disposition to defendants, we reverse and remand for further proceedings consistent with this opinion.

We do not retain jurisdiction. As the prevailing parties, plaintiffs may tax costs. MCR 7.219.

/s/ Brock A. Swartzle
/s/ Michael J. Kelly
/s/ Matthew S. Ackerman