*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

J-DA CROSKEY, a minor, by Next Friend,
DARCELL EALY,

        Plaintiff-Appellant,

and

FELICIA CROSKEY, ALEXIA CROSKEY, a
minor, by Next Friend, DARCELL EALY, and
MAYA CROSKEY, a minor, by Next Friend,
DARCELL EALY,

        Plaintiffs,

v

JAMES EDWIN TANK,

        Defendant-Appellee.

UNPUBLISHED
September 18, 2025
1:15 PM

No. 371418
Wayne Circuit Court
LC No. 23-006052-NI

Before: YOUNG, P.J., and LETICA and KOROBKIN, JJ.

PER CURIAM.

In this third-party automobile negligence action, plaintiff, J-Da Croskey ("J-Da"), by and through her next friend, plaintiff Darcell Ealy, appeals as of right the trial court's order granting summary disposition in favor of defendant James Edwin Tank under MCR 2.116(C)(10). The trial court concluded that J-Da failed to raise a genuine issue of material fact as to whether she suffered a serious impairment of a bodily function under MCL 500.3135. We reverse and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 27, 2022 at approximately 3:50 p.m., J-Da and her two sisters were passengers in their mother's car on the way to the mall. J-Da was seated in the rear passenger-side seat. While traveling southbound on Telegraph Road near the intersection of Ann Arbor Trail in Dearborn Heights, J-Da observed a vehicle in the rearview mirror moving erratically, weaving in and out of

lanes. Without warning, the vehicle rear-ended their car, causing J-Da to jolt forward and strike her head and chest against the seat in front of her.

When police responded to the scene of the accident, they discovered that the driver of the vehicle, defendant, had a diabetic episode that caused him to lose control of his car. No injuries were reported to police at the scene of the crash, and no ambulances were called for either party to be medically evaluated at the scene. After getting out of her car to inspect for crash damage, J-Da's mother noticed that the damage to her car was concentrated on the rear passenger side of the car. Despite the damage, the vehicle remained operable, and J-Da and her family proceeded to Henry Ford Hospital for medical evaluation.

At Henry Ford Hospital on the day of the accident, J-Da's chief complaint was a headache. Doctors concluded that J-Da's pain was likely muscle strain from possible whiplash and gave her Tylenol for pain management. Upon examination, J-Da did not have any scars or physical marks on her body from the accident. J-Da was later discharged.

Due to the ongoing pain she continued experiencing in her neck and back after the emergency room visit, J-Da sought additional care for her injuries from a chiropractor, Dr. Michael Meeron at New Grace Spinal Rehabilitation Center. Dr. Meeron began treating J-Da two days after the accident, from June 29, 2022, and continued through August 17, 2022. During the course of treatment, Dr. Meeron ordered an MRI of her neck. The MRI, dated August 12, 2022, revealed an acute herniated cervical disc at C4-C5 in J-Da's neck. In a sworn affidavit, Dr. Meeron stated that he "believed with medical certainty that the [MRI findings] were caused by her accident on June 27, 2022."

J-Da also experienced ongoing chest pain and testified she received treatment for it from doctors at Beaumont Family Medicine in Westland. There, she reported pain with breathing and a "crackling" sensation in her chest on movement. She described continued pain and breathing issues that interfered with activities like running track, specifically citing shortness of breath and chest discomfort during exertion. On July 7, 2022, about a week after she began receiving chiropractic treatment, J-Da visited Beaumont Family Medicine Westland, where she complained of persistent back pain and shortness of breath, telling doctors she felt she "[couldn't] take a deep breath," and had pain when she did. A few days later, on July 10, 2022, she was seen by doctors at Oakwood Hospital and Medical Center for sharp right sternal chest pain, which she described as "crackling." J-Da explained that this pain worsened when she was breathing deeply and moving, and that she found no relief from over-the-counter medications.

J-Da continued treating with Dr. Meeron until her last visit on August 17, 2022. She stopped going to New Grace Spinal Rehabilitation Center because she was beginning school and needed a clinic that was open on Saturdays. Dr. Meeron's notes from that office visit indicate that while she could no longer continue treatment at his facility, he believed she needed to seek ongoing care, as the MRI showed disc pathology at C4-C5. The record is unclear as to whether J-Da received treatment for the following months until an X-ray was taken on October 3, 2022. Although the X-ray showed clear lungs, J-Da continued to present intermittently with chest pain and breathing difficulties for over a year following the accident.

J-Da was a 14 year old high school student at the time of the accident. She testified that she participated in track since she was in middle school and that she participated in the track season following the accident. That is when she noticed that the accident affected her ability to run. J-Da stated that when she ran, she experienced shortness of breath and chest pain and her race times were better before the accident. Nonetheless, J-Da stated that she was determined to continue participating in future track seasons.

During J-Da's deposition on August 11, 2023, the following exchange occurred:

Q [Defendant's counsel:]. Did this [June 27, 2022] accident affect your ability to do track in the spring of 2023?

A [J-Da:]. Yes.

Q. How so?

A. My breathing.

Q. Tell me more about your breathing.

A. Like, just shortness of breath. And sometimes my – like, it would just – like, my chest would just hurt.

**Q. Any other hobbies or activities that you did before the accident that were affected by the accident?**

**A. No.**

Q. Just the track?

A. Yeah.

Q. Did you run track in middle school?

A. Yes.

Q. Were your times better your freshman year or in middle school?

A. Freshman year.

**Q. What did you do this summer [the summer of 2023]? Any camps or anything like that?**

**A. Mostly go out with my friends, like, to movies, like, two times. And, like, three carnivals just to meet up with friends.**

**Q. Has your ability to be with your friends been affected by this accident?**

*A.* **Yes.**

*Q.* **Okay. How so?**

*A.* **Because last summer when we got in the car accident we only went to the chiropractor only, not out.**

*Q.* So last summer—okay. Strike that.

How about this summer 2023, has your ability to hang out with your friends been affected?

*A.* No. (Emphasis added.)

On cross-examination, J-Da explained she still has ongoing shortness of breath and occasional pain and blurred vision in her right eye.

On May 11, 2023, J-Da, by and through next friend Ealy, filed suit against defendant for negligence. On February 27, 2024, defendant moved for summary disposition, arguing that J-Da could not establish that she sustained a serious impairment of a bodily function, as required under the law, and that defendant was therefore not liable as a matter of law. Specifically, defendant asserted that there existed no genuine issue of material fact as to the nature and extent of the injuries sustained by J-Da, and that the injuries she alleged were not injuries which constituted an objectively manifested impairment of an important bodily function that affected her general ability to lead her normal life.

On March 25, 2024, J-Da responded to defendant's motion for summary disposition, arguing that she did in fact suffer an objective impairment as a result of the accident. That impairment, J-Da contended, was manifested by the acute herniated cervical disc at C4-5, narrowing of the left neural foramen with encroachment on the left C5 exiting nerve root, discovered by an MRI scan. That injury, J-Da alleged, affected her general ability to lead her normal life, as she was unable to run like she could previously. Further, her chiropractor, Dr. Meeron, stated that "severe injuries, which created the need for medical care" were "a result of the accident." Thus, J-Da suffered a threshold injury as a result of defendant's negligent driving.

On April 8, 2024, defendant replied to J-Da's response to his motion for summary disposition, asserting that the affidavit by Dr. Meeron was "void of any alleged impairment." Defendant asserted that the type of correlation Dr. Meeron was making was the type of correlation that has been rejected by the court as "mere speculation." Defendant argued that Dr. Meeron failed to explain in his affidavit how he concluded that the accident was the but-for cause of J-Da's injuries. Additionally, defendant argued that neither Dr. Meeron's affidavit, nor any other evidence or testimony, correlated J-Da's shortness of breath and low stamina with the injuries she suffered. As such, defendant argued that J-Da could not meet her burden of proof as to causation.

The trial court held oral arguments on defendant's motion for summary disposition on April 25, 2024. As to J-Da, the trial court seemingly concluded that she probably had a threshold injury, but it did not seem to affect her ability to lead a normal life: "J-Da does have an MRI with an objective finding relating [her] problems to the motor vehicle accident, and she did testify she was

experiencing some pain in her chest while running, but she still ran. The pain did not keep her from running, apparently." Following oral arguments, the trial court entered an order granting defendant's motion for summary disposition. Plaintiff filed for reconsideration, which the trial court denied. J-Da now appeals.

## II. ANALYSIS

J-Da argues the trial court incorrectly found that she did not suffer a threshold injury as a matter of law and, consequently, erred when it granted defendant's motion for summary disposition. We agree and reverse the trial court's order.

## A. STANDARD OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). Under MCR 2.116(C)(10), summary disposition is appropriate "if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018) (quotation marks and citation omitted). "Because a motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint, the circuit court must consider the affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012).

"A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds could differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "Courts are liberal in finding a factual dispute sufficient to withstand summary disposition." *Patrick*, 322 Mich App at 605 (quotation marks and citation omitted). A court may not "make findings of fact; if the evidence before it is conflicting, summary disposition is improper." *Id*. at 605-606 (quotation marks and citation omitted).

## B. THE TRIAL COURT ERRED IN GRANTING DEFENDANT SUMMARY DISPOSITION UNDER MCR 2.116(C)(10)

J-Da argues that the trial court erred in granting defendant's motion because objective medical evidence, including MRI results and her chiropractor's affidavit, support that J-Da suffered a threshold injury as a result of the accident. Thus, J-Da argues, there remains a genuine issue of material fact regarding whether she had an objectively manifested impairment of an important bodily function that affected her general ability to lead her normal life. We agree with J-Da and reverse and remand for further proceedings.

Under MCL 500.3135, "[a] person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." MCL 500.3135(1). Serious impairment of a body function "means an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." MCL 500.3135(5).

-5-

"On its face, the statutory language provides three prongs that are necessary to establish a 'serious impairment of body function': (1) an objectively manifested impairment (2) of an important body function that (3) affects the person's general ability to lead his or her normal life." *McCormick v Carrier*, 487 Mich 180, 195; 795 NW2d 517 (2010). In making the determination of whether a plaintiff has proven a serious impairment of a bodily function, "there is no bright-line rule or checklist to follow[.]" *Chouman v Home Owners Ins Co*, 293 Mich App 434, 441; 810 NW2d 88 (2011). Instead, "[w]hether someone has suffered a serious impairment is 'inherently fact- and circumstance-specific and [the analysis] must be conducted on a case-by-case basis.'" *Id*. quoting *McCormick*, 487 Mich at 215 (brackets in original). Because no two people are alike, "the extent to which a person's general ability to live his or her normal life is affected by an impairment is undoubtedly related to what the person's normal manner of living is . . . ." *McCormick*, 487 Mich at 202-203. As such, this inquiry is subjective. *Patrick*, 322 Mich App at 607.

As to the first prong, an objectively manifested impairment is one "that is evidenced by actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a body function." *McCormick*, 487 Mich at 196. "Impaired" means the state of (1) "being weakened, diminished, or damaged," or (2) "functioning poorly or inadequately." *Id.* at 197 (quotation marks and citation omitted). Though medical testimony is not always required to make this showing, medical evidence such as a scan of an impairment will make it objectively manifested. *Jackson v Nelson*, 252 Mich App 643, 645, 650-651; 654 NW2d 604 (2002).

Second, the important-bodily-function inquiry is "an inherently subjective" one. *McCormick*, 487 Mich at 199. The inquiry turns on whether the bodily function "has great value, significance, or consequence," and the relationship of that function to the person's life must be considered. *Id*. Generally, walking is regarded an important body function. *Cassidy v McGovern*, 415 Mich 483, 505; 330 NW2d 22 (1982).

As for the third prong, to assess whether the impaired person's ability to lead his or her normal life has been affected, courts are to compare the person's life before and after the injury. *Nelson v Dubose*, 291 Mich App 496, 499; 806 NW2d 333 (2011). Important to making this comparison is the fact that "the statute merely requires that a person's general ability to lead his or her life has been *affected*, not destroyed." *McCormick*, 487 Mich at 202. Therefore, "courts should consider not only whether the impairment has led the person to completely cease a pre-incident activity or lifestyle element, but also whether, although a person is able to lead his or her pre-incident normal life, the person's general ability to do so was nonetheless affected." *Id*. Lastly, there is no "express temporal requirement as to how long an impairment must last in order to have an effect on the person's general ability to live his or her normal life." *Id.* at 203 (quotation marks omitted).

The trial court, at oral arguments on the motion, stated:

With regard to J-Da, she did go to the emergency room after the accident. However, there is nothing remarkable noted in the records. She treated again with the same chiropractor. She also had an MRI. The chiropractor signed an affidavit

-6-

stating that, again, "I believe with medical certainty the following findings of J-Da, cervical spine MRI were caused by the accident."

The MRI found acute herniated cervical disc narrowing the left neuroforamen encroaching on the left C-5 existing nerve, along with other ligament injuries.

J-Da testified at her deposition that she ran track and sometimes had chest pain. And she also claimed injury to her right eye and ear, but never received treatment or a diagnosis concerning her alleged injury.

\* \* \*

J-Da [has] the chiropractor notes and affidavit, but very little impact on [her] ability to lead a normal life.

\* \* \*

J-Da does have an MRI with objective finding relating her problems to the motor vehicle accident, and she did testify she was experiencing some pain in her chest while running, but she still ran. The pain did not keep her from running, apparently.

By granting summary disposition in favor of defendant, the trial court found "there is either no objective manifestation or no [e]ffect on [her] ability to lead [her] normal life." We agree, in part. On the one hand, J-Da testified about her chest pains which resulted in some additional doctor's visits, although no diagnoses or formal treatment and no injuries were revealed in the MRI. Those chest pains manifested as a "crackling" and/or difficulty breathing that compromised J-Da's ability, though not completely, to run track. We agree with the trial court that this was insufficient to create a question of fact as to the objective manifestation and as to the ability to lead a normal life. However, the trial court also acknowledged the MRI results and the chiropractor's affidavit both support the presence of an objectively manifested injury to J-Da's neck.

The more difficult question is whether there is anything on this record to support that these injuries, while serious and manifest and causally linked to the accident, impeded J-Da's ability to lead a normal life. Defendant also noted that J-Da did not miss any school, did not suffer any physical scars or marks from the accident, and participated in the track season after the accident. And, we agree with defendant that the "complaints of stamina and shortness of breath are very separate and distinct to have a causal connection with her cervical spine."

We also agree with defendant that, seemingly, J-Da's treatment for her injuries only lasted a matter of months, after which time she was able to return to something very closely resembling her normal life. Yet, we also acknowledge that a person's ability to lead his or her general life does not have to be destroyed in order to constitute a threshold injury; it only needs to have been affected, and here the evidence allows for an inference that J-Da's general ability to lead her normal life was affected, though not completely destroyed. See *McCormick*, 487 Mich at 202. Moreover, a serious impairment of body function does not have to be permanent, so the fact that

J-Da's injuries or treatment for those injuries only lasted a matter of months has no bearing on the question at hand. See *id*.

Further, while the evidence is not necessarily strong, J-Da's testimony is enough to create a question of fact as to whether her ability to lead her normal life is compromised. We readily admit that this case is distinguishable from, for example, *Piccione as Next Friend of Piccione v Gillette*, 327 Mich App 16; 932 NW2d 197 (2019). In *Piccione*, a three-year-old child, Gavino, suffered an impairment, a fractured clavicle, following a car accident *Id*. at 17. Gavino's parents testified to the following changes in their child's life following the accident:

> he was unable to go to school for approximately two weeks and that when he did return to school he was unable to use the play equipment. Additionally, they testified that after the accident they had to help him go to the bathroom, including by carrying him to the bathroom. His father testified that before the accident, Gavino could dress himself, but afterward he could not. There was also testimony that Gavino needed help going up and down stairs because his balance was negatively affected by his impairment. Further, at times, his ability to sleep without pain was also compromised; his father testified that on occasion Gavino would wake up complaining about shoulder pain. The record also reflects that before the accident Gavino liked to color, but after the accident he did not want to do so. And before the accident he rode his bicycle, played soccer, and played with his scooter in the basement, but after he was injured he was unable to do so. His mother testified that, generally, Gavino was "cautious" about physical activities after the accident. Viewing these facts in the light most favorable to plaintiff, a jury could conclude that Gavino's general ability to lead his normal life was affected by the impairment. [*Id*. at 21-23.]

This Court noted the arguments from opposing counsel—that the impairment did not last, that Gavino only missed two weeks of school—were relevant but also evidenced a "factual conflict with regard to the nature and extent of his injury" rendering summary disposition inappropriate. *Id*. J-Da's case lacks the detail of lifestyle changes reported by Gavino's parents but the record here is not wholly silent. J-Da's accident took place in the summer, and J-Da testified that her typical summer with her friends was compromised by the car accident, and more specifically the spinal injury, because that summer she "only went to the chiropractor, not out." To revisit pertinent facts, J-Da was a 14-year-old girl at the time of the accident. She was unemployed, unable to drive, and the accident occurred when school was not in session. As a result, the one thing she did with regularity—hang out with friends—was totally or at least substantially removed from her life for a period of several weeks if not months, not unlike the timeframe for which Gavino's life was compromised in *Piccione*. That J-Da attributed this to her doctor's appointments, rather than say, pain or fear, is seemingly not dispositive either. While neither party provides this Court much in the way of caselaw, we cannot find any caselaw ourselves that would preclude considering the volume of doctor's appointments as a consideration in whether an injury impeded one's ability to lead a normal life. In fact, in *McCormick*, 487 Mich at 218, the Court considered the plaintiff's two surgeries and multiple months of physical therapy in whether the plaintiff was unable to lead a normal life. And logically, this makes sense. While J-Da's inability to be with friends is different than Gavino's inability to color or use the bathroom independently in *Piccione*, both can be causally linked back to their injuries from a car accident.

The evidence highlighted by defendant, taken together with J-Da's deposition testimony and medical history, establish that there is a factual conflict with the nature and extent of J-Da's injuries, in which case, summary disposition is not appropriate. And when considering a motion for summary disposition under MCR 2.116(C)(10), a "trial court is not permitted to assess credibility, weigh evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant [the] motion." *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013).

As such, we find that a genuine issue of material fact remains as to whether J-Da's injury affected her ability to lead her normal life, and summary disposition was not proper. Therefore, we reverse the trial court's order and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Adrienne N. Young
/s/ Daniel S. Korobkin